238

## ASYLUM HILL PROBLEM SOLVING REVITALIZATION ASSOCIATION ET AL. *v.* GARY E. KING
### (SC 17313)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued October 24, 2005—officially released February 21, 2006

*Sarah W. Poston*, with whom were *Jonathan B. Orleans*, and, on the brief, *Annette M. Lamoreaux*, for the appellants (plaintiffs).

*Sheila A. Huddleston*, with whom were *Derek L. Mogck* and, on the brief, *Joseph P. Williams*, for the appellee (defendant).

*Shelley A. White, Greg Bass, Anne Louise Blanchard, Susan Ann Silverstein*, pro hac vice, *Michael Schuster*, pro hac vice, *Thomas Behrendt, Raphael Podolsky* and *Erin Kemple* filed a brief for the American Association of Retired Persons et al. as amici curiae.

*Opinion*

KATZ, J. The plaintiffs, the Asylum Hill Problem Solving Revitalization Association (revitalization association) and Adrienne Brown, appeal from the judgment of the trial court rendered in favor of the defendant, Gary E. King, the president and executive director of the Connecticut Housing Finance Authority (finance authority), following the trial court's decision to strike all three counts of the plaintiffs' complaint. Generally stated, the issue in this appeal is whether the plaintiffs can bring a cause of action to compel the finance authority to take affirmative steps to prevent racial segregation and high concentrations of poverty that allegedly have resulted from its administration of a federal low income housing tax credit program (tax credit program). More specifically, the plaintiffs claim that the following state and federal fair housing laws confer a private right of action affording equitable relief: (1) General Statutes

§ 8-37cc (b);[1] and (2) pursuant to 42 U.S.C. § 1983,[2] 42 U.S.C. § 3608 (d) of the federal Fair Housing Act[3] and 26 C.F.R. § 1.42-9, the federal regulation authorizing a low income tax housing credit.[4] We conclude that these provisions do not create a private right of action and, accordingly, we affirm the judgment of the trial court.

The record discloses the following undisputed facts and procedural history. Brown is a low income African-American resident of the Asylum Hill neighborhood in

---

[1] General Statutes § 8-37cc provides: "(a) Each housing agency, as defined in section 8-37aa, shall, within available resources and to the extent practicable, serve households with incomes less than fifty per cent of the area median income, including households with incomes less than twenty-five per cent of the area median income. In administering its programs each housing agency shall attempt to serve households in the lower range of the income group for which the housing program was developed.

"(b) Each housing agency shall affirmatively promote fair housing choice and racial and economic integration in all programs administered or supervised by such housing agency."

[2] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[3] Section 3608 (d) of title 42 of the United States Code, entitled "Cooperation of Secretary [of Housing and Urban Development] and executive departments and agencies in administration of housing and urban development programs and activities to further fair housing purposes," provides: "All executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory or supervisory authority over financial institutions) in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes."

[4] Section 1.42-9 (a) of title 26 of the Code of Federal Regulations provides in relevant part: "General Rule. If a residential rental unit in a building is not for use by the general public, the unit is not eligible for a section [tax] 42 credit. A residential rental unit is for use by the general public if the unit is rented in a manner consistent with housing policy governing non-discrimination, as evidenced by rules or regulations of the Department of Housing and Urban Development (HUD) . . . ."

Hartford, and the revitalization association is an incorporated entity representing the interests of residents and institutions concerned with the quality of life and the future of that neighborhood. The finance authority is a political subdivision of the state, established for the purpose of alleviating the shortage of housing for low and moderate income families and persons. General Statutes §§ 8-244 and 8-250. One of the programs that the finance authority is responsible for administering within this state is a federal tax credit program that provides development funds to both for-profit and non-profit housing developers through the sale of tax credits.

In August, 2001, the finance authority approved a reservation of tax credits for two buildings in the Asylum Hill neighborhood to provide low income housing. This grant was in addition to a tax credit the authority previously had granted for another rental development located nearby in the same neighborhood. Together, the projects will result in a substantial additional concentration of low income families in the Asylum Hill area, where 47.3 percent of the current residents are at or below the federal poverty level and where fewer than 5 percent of the students enrolled in the elementary school are white and 72 percent are in the free and reduced lunch program. Shortly after the August, 2001 approval of the tax credits, the revitalization association and individual residents of the Asylum Hill neighborhood filed a request with the defendant for a declaratory ruling pursuant to General Statutes § 4-176. In essence, the plaintiffs sought a ruling requiring the finance authority to revise its practices and procedures for funding applications under the federal tax credit program so as to minimize racial and economic segregation.[5]

---

[5] Specifically, the plaintiffs requested a declaratory ruling on the following four questions: (1) does § 8-37cc (b) bar the finance authority from placing additional low income rental units utilizing the tax credit program within areas of minority or poverty concentration; (2) does § 8-37cc (b) require the finance authority to revise its procedures for review of funding applications

After the finance authority did not respond to that request within six months, the plaintiffs filed this action, in three counts, alleging: (1) a violation of § 8-37cc (b); (2) a violation of 42 U.S.C. § 3608 (d) of the federal Fair Housing Act; and (3) violations of 42 U.S.C. § 3608 (d) and 26 C.F.R. § 1.42-9 enforceable through 42 U.S.C. § 1983. They sought declaratory and injunctive relief requiring the finance authority to adopt appropriate statewide standards and site review in order to limit economic and racial segregation and, until such standards are in place, an order barring the authority from locating in the Asylum Hill neighborhood, or in any other racially or economically isolated neighborhoods, new housing developments that utilize the tax credit program. The plaintiffs alleged that, contrary to its statutory obligations, the finance authority had failed to: (1) collect and analyze data regarding relevant racial composition; and (2) adopt rules restricting the placement of low income housing developments in racially concentrated, high poverty areas. The plaintiffs further alleged that the finance authority had adopted policies and practices that have had adverse effects, including increased overcrowding and segregation in neighborhood schools, decreased access to employment among community residents, decreased home ownership rates and neighborhood stability, and diminished access to government services and assistance as a result of strains on state and municipal services. The plaintiffs alleged that they had suffered direct harm from the finance authority's practices, including interference with the

under the tax credit program to prevent segregation and concentration of family housing developments in areas of minority or poverty concentration; (3) is the finance authority in violation of the affirmative requirements of § 8-37cc (b) or General Statutes § 46a-64c in its administration of the federal tax credit program by placing a substantial majority of low income family units inside high poverty, racially concentrated neighborhoods; and (4) is the finance authority obligated to take affirmative steps under § 8-37cc (b) or § 46a-64c to ameliorate the segregative effects of its past administration of the federal tax program in Connecticut.

revitalization association's efforts to plan for the neighborhood and the loss of benefits associated with living in a more racially and economically integrated community.

The defendant moved to dismiss the plaintiffs' action on the ground that they lacked standing to sue under the statutory and regulatory provisions on which their claims were based. Upon conditional agreement by the parties, the trial court treated the defendant's motion as a motion to strike and granted the motion, striking all three counts of the plaintiffs' amended complaint.[6] With respect to the plaintiffs' claim under state law, the trial court applied the three-prong test established by this court in *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 250, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997), and held that § 8-37cc (b) does not create an implied private cause of action because: (1) the plaintiffs are not part of the class intended to benefit from the enactment; (2) the legislative history does not indicate an intent to create a private right of action; and (3) providing a private cause of action is not consistent with the underlying purposes of the legislative scheme. The trial court also addressed the plaintiffs' claims under federal law, concluding that an implied right of action does not arise directly from § 3608 (d) under the standard set forth by the United States Supreme Court in *Gonzaga University* v. *Doe*, 536 U.S. 273, 283, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). Specifically, the trial court held that neither the statutory language, nor the statutory scheme, supported

---

[6] The trial court concluded that the plaintiffs sufficiently had alleged classical aggrievement so as to give them standing and to give the court jurisdiction. The parties then agreed at oral argument to treat the defendant's motion as a motion to strike without prejudice to the defendant's right to file other motions raising issues not yet addressed. Because this procedural posture does not effect our substantive review, we do not address it.

an implication that such a right of action exists.[7] Applying the *Gonzaga University* reasoning, the trial court also held that the plaintiffs could not bring an action pursuant to 42 U.S.C. § 1983 to assert violations of § 3608 (d) and 26 C.F.R. § 1.42-9 (a), the tax regulation related to that section, because the language in § 3608 (d) was not phrased in terms of persons benefited and, therefore, did not reflect a legislative intent to confer rights upon the plaintiffs. Accordingly, the trial court granted the motion to strike all three counts of the plaintiffs' complaint and rendered judgment for the defendant. This appeal followed.[8]

The plaintiffs make three claims: (1) applying a proper *Napoletano* analysis, there is an implied private right of action under § 8-37cc (b); (2) applying the proper standard under federal case law, § 3608 (d) is enforceable under § 1983; and (3) 26 C.F.R. § 1.42-9 (a) similarly is enforceable under § 1983. The defendant responds that the trial court applied the appropriate standards in its analysis of both state and federal law and, therefore, there is no private right of action available to the plaintiffs.

Before addressing the merits of the plaintiffs' claims, we set out the well established standard of review in an appeal challenging the grant of a motion to strike. "Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the

[7] The plaintiffs' complaint also alleged that the defendant's actions violated the federal Fair Housing Act, 42 U.S.C. § 3601 et seq., generally. In their brief to the trial court, however, they claimed that this allegation was sufficient to state a cause of action generally under 42 U.S.C. § 3604 of the Fair Housing Act. The trial court granted the motion to strike the plaintiffs' allegations under the Fair Housing Act based on its determination that their pleadings were not sufficiently specific. That decision is not at issue in this appeal.

[8] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

court's ruling on the [defendant's motion] is plenary.
. . . [I]f facts provable in the complaint would support
a cause of action, the motion to strike must be denied.
. . . Moreover, we note that [w]hat is necessarily
implied [in an allegation] need not be expressly alleged.
. . . It is fundamental that in determining the suffi-
ciency of a complaint challenged by a defendant's
motion to strike, all well-pleaded facts and those facts
necessarily implied from the allegations are taken as
admitted. . . . Indeed, pleadings must be construed
broadly and realistically, rather than narrowly and tech-
nically." (Citations omitted; internal quotation marks
omitted.) *Gazo* v. *Stamford*, 255 Conn. 245, 260, 765
A.2d 505 (2001).

I

The first issue we decide is whether § 8-37cc (b)
confers a private right of action affording equitable
relief. Section 8-37cc (b) provides: "Each housing
agency shall affirmatively promote fair housing choice
and racial and economic integration in all programs
administered or supervised by such housing agency."
Because there is no dispute that the statute does not
expressly authorize a right of action, the issue is
whether there is an implied right of action.[9]

We begin our analysis by noting that, as the party
seeking to invoke an implied right of action, the plain-
tiffs bear the burden of demonstrating that such an
action is created implicitly in the statute. In order to
overcome the presumption in Connecticut that private
enforcement does not exist unless expressly provided
in a statute, the plaintiffs must demonstrate that, in

---

[9] Because § 8-37cc is silent with respect to whether it conveys a private
right of action, our analysis is not limited by General Statutes § 1-2z, requiring
that the meaning of statutes be ascertained only from their text and their
relationship to other statutes if those sources indicate an unambiguous
meaning. *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn.
363, 372, 880 A.2d 138 (2005).

applying the three part test we established in *Napole-tano* v. *CIGNA Healthcare of Connecticut, Inc.*, supra, 238 Conn. 249, no factor weighs against affording an implied right of action and the balance of factors weighs in their favor.[10] Under that test, we examine: "First, is the plaintiff one of the class for whose . . . benefit the statute was enacted . . . ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" (Internal quotation marks omitted.) Id.; see also *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 378–79 n.9, 880 A.2d 138 (2005) (no implied right of action in Liquor Control Act, General Statutes § 30-1 et seq., for liquor distributors to enforce price regulations); *Pane* v. *Danbury*, 267 Conn. 669, 679, 841 A.2d 684 (2004) (no implied right of action in Freedom of Information Act, General Statutes § 1-200 et seq., for those seeking to enforce privacy interest).

In examining these three factors, each is not necessarily entitled to equal weight. Clearly, these factors

---

[10] In *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, supra, 238 Conn. 232–33, we adopted three of the four factors prescribed by the United States Supreme Court in *Cort* v. *Ash*, 422 U.S. 66, 80–84, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975), for determining when an implied right of action will be recognized under federal law. As that court later noted, these "three factors . . . the language and focus of the statute, its legislative history, and its purpose . . . are ones traditionally relied upon in determining legislative intent." (Citation omitted.) *Touche Ross & Co.* v. *Redington,* 442 U.S. 560, 575–76, 99 S. Ct. 2479, 61 L. Ed. 2d 82 (1979). Thus, the *Napoletano* test essentially applies "our well established process of statutory interpretation, under which we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 372, 880 A.2d 138 (2005).

overlap to some extent with each other, in that the ultimate question is whether there is sufficient evidence that the legislature intended to authorize these plaintiffs to bring a private cause of action despite having failed expressly to provide for one. See *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 576, 99 S. Ct. 2479, 61 L. Ed. 2d 82 (1979) (noting that these three factors traditionally are used to determine legislative intent). Therefore, although the plaintiffs must meet a threshold showing that none of the three factors weighs against recognizing a private right of action, stronger evidence in favor of one factor may form the lens through which we determine whether the plaintiffs satisfy the other factors. Thus, the amount and persuasiveness of evidence supporting each factor may vary, and the court must consider all evidence that could bear on each factor. It bears repeating, however, that the plaintiffs must meet the threshold showing that none of the three factors weighs against recognizing a private right of action.

We thus ask first whether the plaintiffs in this case are members of the class intended to benefit from the directive in § 8-37cc (b) that, "[e]ach housing agency shall affirmatively promote fair housing choice and racial and economic integration in all programs administered or supervised by such housing agency." In *Napoletano*, we considered a provision in No. 94-235 (b) of the 1994 Public Acts, which, inter alia, directed that "[a]ll preferred [health care] provider networks shall file with the commission" information relating to its credentialing standards for physicians at specified intervals, and concluded that those provisions benefited both classes of plaintiffs in that case: physicians challenging their removal from the health care network of providers and patients of those physicians. *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, supra, 238 Conn. 249; cf. *Eder Bros., Inc.* v. *Wine Merchants of*

*Connecticut, Inc.*, supra, 275 Conn. 376–78 (price regulations in Liquor Control Act enacted to protect public welfare rather than plaintiff liquor distributors); *Pane v. Danbury*, supra, 267 Conn. 680 (Freedom of Information Act intended to benefit members of general public who desire information about conduct of their government rather than plaintiff seeking to protect privacy interest).

The plaintiffs claim that they are part of the class for whose benefit § 8-37cc (b) was enacted because the fair housing choice and integration promoted by the statute benefits any person who would be eligible for the low income housing created under the tax credit program, including Brown and some of the Asylum Hill neighborhood members represented by the revitalization association.[11] Even if we were to assume, however, that the statute sufficiently evidences an intent to benefit the plaintiffs in this regard, and thereby satisfies the first prong of *Napoletano*, that fact alone does not determine whether a judicially enforceable right has been created.

With respect to the second *Napoletano* factor, we do not find any indication, explicit or implicit, in the legislative history that the legislature intended to create

---

[11] The plaintiffs also contend that the revitalization association is part of the class intended to benefit from the economic and racial integration promoted by § 8-37cc (b) in that the legislature intended to protect residents of urban neighborhoods and metropolitan areas from increased segregation and concentration of poverty, including the residents of Asylum Hill represented by the revitalization association. The defendant responds by noting that such a classification is too broad and contends that it would include all opponents of low income housing, wherever located, as intended beneficiaries of the statute. In light of our conclusion reached later in this opinion that the plaintiffs cannot meet prongs two and three of *Napoletano*, even if they are beneficiaries of the statute as persons eligible for low income housing, we need not decide whether the revitalization association is also an intended beneficiary of the statute if acting on behalf of members who are not eligible for finance authority administered programs, but simply oppose the concentration of low income housing in their neighborhood.

a private cause of action. Indeed, consistent with the discussion that follows, to the extent that there is any implication in the history of § 8-37cc, it is that the legislature intended legislative and executive monitoring of the finance authority's compliance with its statutory directive to promote fair housing and economic and racial integration, rather than judicial enforcement of that directive.

Section 8-37cc (b) was enacted as part of No. 91-362 of the 1991 Public Acts (P.A. 91-362).[12] Public Act 91-

[12] Public Act 91-362 provides: "Section 1. Section 8-37bb of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) On or before December 31, 1991, and annually thereafter, each housing agency shall submit to the general assembly a report, for the year ending the preceding September thirtieth, which analyzes by income group, households served by its housing construction, substantial rehabilitation, purchase and rental assistance programs. Each report submitted after December 31, 1991, shall analyze the the households served under each program by race. The analysis shall provide information by housing development, if applicable, and by program. Each analysis shall include data for all households (1) entering an agency program during the year ending the preceding September thirtieth and (2) in occupancy or receiving the benefits of an agency rental program the preceding September thirtieth. The report of the Connecticut Housing Finance Authority shall also identify, by census tract, the number of households served in each program and the total amount of financial assistance provided to such households. The provisions of this section shall not be construed to preclude a housing agency from reporting additional information on programs it administers. Each report submitted under this section shall also analyze the efforts, and the results of such efforts, of each agency in promoting fair housing choice and racial and economic integration. The provisions of this section shall not be construed to require an occupant or applicant to disclose his race on an application or survey form.

"(b) Each report submitted under this section shall also document the efforts of the agency in promoting fair housing choice and racial and economic integration and shall include data on the racial composition of the occupants and persons on the waiting list of each housing project which is assisted under any housing program established by the general statutes or special act or which is supervised by the agency. The provisions of this subsection shall not be construed to require disclosure of such information by any occupant or person on a waiting list.

"Sec. 2. Section 8-37cc of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) Each housing agency, as defined in section 8-37aa shall, within available resources and to the extent practicable, serve households with incomes

## 362 contained six sections, three of which set forth

less than fifty per cent of the area median income, including households with incomes less than twenty-five per cent of the area median income. In administering its programs each housing agency shall attempt to serve households in the lower range of the income group for which the housing program was developed.

"(b) Each housing agency shall affirmatively promote fair housing choice and racial and economic integration in all programs administered or supervised by such housing agency.

"Sec. 3. (a) Each entity participating in any program administered by a housing agency, as defined in section 8-37aa of the general statutes, under title 8 of the general statutes shall have an affirmative duty to promote fair housing in each housing development that is assisted or supervised under any provision of said title 8.

"(b) Any entity applying for financial assistance under any program administered by a housing agency established by title 8 of the general statutes shall submit an affirmative fair housing marketing plan to such housing agency for its approval. Such plan shall have provisions for recruitment of an applicant pool that includes residents of municipalities of relatively high concentrations of minority populations. The housing agency shall periodically review each plan to assure that to the extent practicable such an applicant pool is created and may require that a plan be revised by the entity submitting it.

"Sec. 4. Section 8-37t of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) The commissioner of housing together with the Connecticut Housing Finance Authority, shall prepare and from time to time amend a five-year advisory plan, which plan shall conform and be subject to the plan of conservation and development for the state adopted by the general assembly. The plan shall contain (1) an assessment of the housing needs of households with incomes less than one hundred per cent of the average area median income, adjusted for family size, analyzed separately for households with incomes (A) less than twenty-five per cent of the area median income, (B) more than twenty-five per cent but not more than fifty per cent of the area median income, (C) more than fifty per cent but not more than eighty per cent of the area median income, and (D) more than eighty per cent but not more than one hundred per cent of the area median income, (2) a set of specific proposals for meeting such needs and (3) information on affirmative fair housing marketing activities and programs and an analysis of occupancy results of affirmative fair housing marketing plans. The assessment prepared under subdivision (1) shall include an analysis of available census data. The commissioner of housing shall annually submit a supplementary report detailing the extent to which housing needs identified in the plan were met during the preceding year.

"(b) Said housing plan shall be submitted to the governor and the secretary of the office of policy and management on or before January 1, 1993, and

## the fair housing directive to housing agencies, which

subsequent plans shall be submitted every five years thereafter. The commencement date of each plan shall be the July first following the submission of the plan.

"Sec. 5. Section 8-345 of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) The commissioner of housing shall implement and administer a program of rental assistance for low-income families living in privately-owned rental housing and elderly persons who reside in state-assisted rental housing for the elderly. For the purposes of this section, a low-income family is one whose income does not exceed sixty per cent of the median family income for the area of the state in which such family lives, as determined by the commissioner.

"(b) Housing eligible for participation in the program shall comply with applicable state and local health, housing, building and safety codes.

"(c) In addition to an element in which rental assistance certificates are made available to qualified tenants, to be used in eligible housing which such tenants are able to locate, the program may include a housing support element in which rental assistance for tenants is linked to participation by the property owner in other municipal, state or federal housing repair, rehabilitation or financing programs. The commissioner shall use rental assistance under this section so as to encourage the preservation of existing housing and revitalization of neighborhoods or the creation of additional rental housing.

"(d) The commissioner shall administer the program under this section to promote housing choice for certificate holders and encourage racial and economic integration. The commissioner shall establish maximum rent levels for each municipality in a manner that promotes the use of the program in all municipalities. Any certificate issued pursuant to this section may be used for housing in any municipality in the state. The commissioner shall inform certificate holders that a certificate may be used in any municipality and, to the extent practicable, the commissioner shall assist certificate holders in finding housing in the municipality of their choice.

"(e) Nothing in this section shall give any person a right to continued receipt of rental assistance at any time that the program is not funded.

"(f) The commissioner shall adopt regulations in accordance with the provisions of chapter 54 to carry out the purposes of this section. The regulations shall establish maximum income eligibility guidelines for such rental assistance and criteria for determining the amount of rental assistance which shall be provided to eligible families and elderly persons.

"(g) The commissioner shall submit to the general assembly, on or before February 5, 1988, an analysis and evaluation of the operation and effectiveness of the program authorized under the section.

"(h) On or before December 31, 1992, the commissioner shall submit to the committee of the general assembly having cognizance of matters relating to housing a report on the program established under this section. Such

includes the finance authority, and to the entities that receive financial assistance from those agencies for housing developments (participating entities). Specifically, two of these sections impose an affirmative duty on the housing agencies and the participating entities to promote fair housing and, in the case of the participating entities, to prepare affirmative marketing plans to attract minority applicants. See P.A. 91-362, §§ 2 and 3. A third section imposes a duty on the commissioner of housing (commissioner) to administer the rental assistance program in such a way as to promote racial and economic integration. P.A. 91-362, § 5. In furtherance of that directive, the commissioner must establish maximum rents in a manner that promotes the program in all municipalities and must inform participants that they may utilize the assistance in any municipality. Id.

report shall include an analysis of the effectiveness of the program in promoting racial and economic integration.

"Sec. 6. Subsection (a) of section 8-115a of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) No housing project or projects for elderly persons shall be developed until the commissioner of housing has approved the site, the plans and specifications, the estimated development cost, including administrative or other cost or expense to be incurred by the state in connection therewith as determined by said commissioner, and an operation or management plan for such project or projects which shall provide an income, including contributions expected from any source, which shall be adequate for debt service on any notes or bonds issued by an authority to finance such development cost, administration, including a state service charge as established by the commissioner, other operating costs and establishment of reasonable reserves for repairs, maintenance and replacements, vacancy and collection losses. During the period of operation of such project or projects, the authority, municipal developer, nonprofit corporation or housing partnership shall submit to the commissioner for his approval its rent schedules and its standards of tenant eligibility and continued occupancy any changes therein, and its proposed budget for each fiscal year, together with such reports and financial and operating statements as the commissioner finds necessary. Such authority, municipal developer, nonprofit corporation or housing partnership shall so annually submit verification that the significant facilities and services required to be provided to the residents of such project pursuant to title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (42 U.S.C. 3600 et seq) are being provided."

Significantly, three sections of the public act impose data collection and reporting requirements to either the executive or the legislative branch regarding the housing agencies' efforts to promote fair housing choice and racial and economic integration. See P.A. 91-362, §§ 1, 4 and 5. Specifically, the participating entities must submit to the housing agencies their affirmative marketing plans for recruitment of applicants from municipalities having a high concentration of minority populations. P.A. 91-362, § 3. The housing agencies periodically must review the plans for compliance and may require that the plans be revised. Id. The agencies in turn must submit, annually, a report to the General Assembly that, inter alia, documents and analyzes "the efforts, and the results of such efforts, of each agency in promoting fair housing choice and racial and economic integration." Id., § 1 (a); see id., § 1 (b). Finally, the commissioner and the finance authority are charged with preparing and amending a five year plan to the General Assembly that contains, inter alia, "information on affirmative fair housing marketing activities and programs and an analysis of occupancy results of affirmative fair housing marketing plans." Id., § 4. The final section of the public act also addresses reporting requirements, in this instance requiring operators of housing for the elderly to certify to the commissioner their compliance with certain aspects of the federal Fair Housing Act. See id., § 6. Thus, essentially, the legislative directives to promote fair housing choice were linked directly with strong reporting requirements to enable legislative and executive oversight for compliance. Such an enforcement mechanism entrusted to the other two branches of government counsels strongly against finding a legislative intent to provide for judicial enforcement of the directive through a private cause of action.[13]

[13] The plaintiffs adopt the trial court's observation that the legislative history of § 8-37cc is not illuminating and, in turn, contend that it is more consistent with prior cases to interpret legislative silence as permitting an

We also conclude that the plaintiffs do not meet their burden under the third prong of the *Napoletano* test: whether it is consistent with the underlying purposes of the legislative scheme to imply such a private remedy for the plaintiffs. The relation of a statutory provision to other statutes is an important guide to the meaning.[14] Here, the relationship is dispositive.

As we have noted, § 8-37cc (b) was enacted by the legislature in 1991. This action took place during a two year period within which the legislature addressed fair housing issues in an effort to conform state law to federal fair housing standards. In 1990, the legislature amended the human rights provisions of chapter 814c of the General Statutes to prohibit discrimination in housing based on race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income, or familial status. Public Acts 1990, No. 90-246 (P.A. 90-246); see also General Statutes §§ 46a-64b and 46a-64c (a). In so doing, it provided for enforcement of those provisions through both an administrative remedy and an express private right of action. P.A. 90-246, §§ 9

implied right of action. This argument ignores the burden that plaintiffs bear in establishing that a private right of action exists implicitly in a statute. Moreover, although it is true that we concluded in *Napoletano* that the statute created an implied right of action despite the fact that the legislative history in *Napoletano* was silent as to whether the legislature intended to create or ban a private right of action, the other two factors militated strongly in favor of the plaintiffs. *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, supra, 238 Conn. 249. Here, in stark contrast, to the extent that there is an implication in the legislative history, it is that monitoring of statutory compliance was intended to rest with the legislative and executive branches, rather than within the judicial branch of government.

[14] See, e.g., General Statutes § 1-2z ("[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes"); *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) ("we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter" [internal quotation marks omitted]).

through 14; see also General Statutes §§ 46a-82 (administrative complaint procedure) and 46a-98a (private right of action by person aggrieved by violation of § 46a-64c).

The following year, when the legislature enacted the statutory language under which the plaintiffs claim an implied right of action, § 8-37cc (b), the legislature did not provide similarly for either an administrative remedy or a private right of action.[15] It is particularly telling that the legislature did not place the fair housing choice directive in chapter 814c, which concerns human rights and opportunities and which contains administrative and judicial enforcement provisions. Rather, it placed the directive in chapter 127c, the focus of which is governmental administration of state housing agencies, not individual rights.[16] As we have noted previously, the oversight mechanisms in chapter 127c are provided by way of administrative and legislative, rather than judicial, review.[17] "As we have stated many times, [w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That

---

[15] We note that, during the same session that the legislature added § 8-37cc (b) to chapter 127c of the General Statutes, it amended the fair housing provisions of chapter 814c that contain judicial enforcement provisions to include a prohibition against housing discrimination based on sexual orientation. See Public Acts 1991, No. 91-58. Thus, we presume that the legislature was mindful of private enforcement when it enacted § 8-37cc, but chose not to provide for it.

[16] The provisions in chapter 127c include: the creation of the department of economic and community development and defining of its powers as the lead agency for housing matters; see General Statutes §§ 8-37r, 8-37y and 8-37pp; the establishment of reporting requirements for housing agencies to the executive and legislative branches; see General Statutes §§ 8-37s, 8-37t (b), 8-37u (c) and (d), and 8-37bb; and the authorization of various funding mechanisms. See General Statutes §§ 8-37qq and 8-37vv.

[17] See, e.g., General Statutes §§ 8-37u (d) (finance authority to provide commissioner of economic and community development with twelve month operating plan) and 8-37bb (finance authority reports to legislature).

tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them." (Internal quotation marks omitted.) *Doe* v. *Marselle*, 236 Conn. 845, 861, 675 A.2d 835 (1996). Had the legislature intended to create a right judicially enforceable by individual citizens, it more likely would have placed the § 8-37cc (b) fair housing choice directive in chapter 814c along with its express prohibitions against discriminatory housing practices.

Finally, we note that the broader legislative scheme within which § 8-37cc resides requires the finance authority to balance the public policy expressed in § 8-37cc (b), namely, the promotion of fair housing choice and economic and racial integration, with the terms and conditions of the federal programs in which the finance authority participates. General Statutes § 8-205 (3). These terms and conditions include, for example, the requirement that state agencies implementing the tax credit programs give preference to projects serving the lowest income tenants for the longest period of time in areas of concentrated poverty. See 26 U.S.C. § 42-(m) (1) (B) (ii). The legislative scheme also expresses the urgent need in Connecticut for demolition of slum areas and reconstruction of decent and affordable housing in those areas. See General Statutes §§ 8-38, 8-39 (i) and 8-242. The directive in § 8-37cc (a) requiring each housing agency to "serve households with incomes less than fifty per cent of the area median income" acknowledges that this can only be done "within available resources and to the extent practicable . . . ." This balancing of policy goals and available resources more appropriately is overseen through the administrative and legislative monitoring provided in P.A. 91-362 than by private citizens seeking judicial

enforcement of one requirement, possibly at the expense of another requirement not before the court.[18]

The plaintiffs contend, however, that the existence of other remedies such as legislative and executive oversight does not mean that they fail to satisfy the third *Napoletano* factor. They further claim that the court's focus must be on the adequacy of the remedies, rather than their existence. In other words, the plaintiffs claim that, because the defendant has failed to comply with the mandated reporting requirements and the legislature has failed to take action to ensure its compliance, judicial enforcement is appropriate. This argument, however, misconstrues the court's role in applying the *Napoletano* test. We do not decide whether the legislature *should* have supplied a private right of action; rather, we consider whether and how remedies were provided as an indication of the legislature's intent to confer a private right of action. The plaintiffs also contend that the legislative history of the statute indicates that the legislature's purpose was to benefit the very people now seeking to enforce it in that § 8-37cc (b) was part of a comprehensive strategy to combat segregation in Connecticut. We recognize that it might further the goal of integration to allow the plaintiffs to take judicial action to force the finance authority to comply with its reporting obligations. In determining whether it would be consistent with the purpose of the statute to permit such an action, however, we must look not only to the broad purpose of the enactment of which § 8-37cc (b) was a part, but also to the more specific purpose evidenced by the choices made by the legislature as to how the particular provision would ensure

[18] We note that § 8-37bb (a) was amended in 2005. See Public Acts 2005, No. 05-191, § 4. To the extent, if any, that the 2005 amendments affect an analysis of the finance authority's compliance with § 8-37bb reporting requirements, we note that they indicate merely the General Assembly's reliance on the reports and their use as a legislative and administrative enforcement tool.

enforcement of its integration goals. For the reasons already cited, we cannot engraft an enforcement mechanism that overrides the legislature's apparent intent to reserve that authority to the executive and legislative branches. To the extent that the legislature has chosen not to demand compliance with the reporting requirements and thereby has failed to monitor the defendant's efforts to promote integration, the plaintiffs' remedy is political, not judicial. Indeed, the plaintiffs' goals are laudable, and we hope the legislature gives the issue the attention that such a serious problem merits.

Accordingly, we conclude that the purpose of § 8-37cc (b) is made clear by the legislature's placement of the directive in the administrative chapter, and that purpose is not consistent with an implied private remedy. Therefore, the plaintiffs have failed to demonstrate that § 8-37cc (b) creates a private right of action.

## II

The plaintiffs also claim that 42 U.S.C. § 3608 (d),[19] the federal statute on which § 8-37cc (d) was modeled, and 26 C.F.R. § 1.42-9,[20] a tax regulation incorporating fair housing rules, create private rights that are enforceable pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides in relevant part: "Every person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

## A

We begin by determining whether § 3608 (d) creates the "rights, privileges, or immunities" for which § 1983

---

[19] See footnote 3 of this opinion.

[20] See footnote 4 of this opinion.

provides a remedy. The plaintiffs contend that, in *Blessing* v. *Freestone*, 520 U.S. 329, 340–41, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997), the United States Supreme Court set forth three factors for determining whether a statute creates a federal right.[21] Although they recognize that the Supreme Court articulated a more stringent analysis in *Gonzaga University* v. *Doe*, supra, 536 U.S. 283, the plaintiffs contend that this higher standard is limited to statutes enacted pursuant to Congress' spending power. The plaintiffs assert that § 3608 (d) satisfies the *Blessing* test and, specifically, that they are among those intended to "benefit" from the provision. The defendant claims that, in *Gonzaga University* v. *Doe*, supra, 282–83, the Supreme Court clarified the *Blessing* test to require an unambiguously conferred right and that this standard controls all § 1983 claims. The defendant contends that, applying the *Gonzaga University* analysis, § 3608 (d) does not create the unambiguous right required. We agree with the defendant that the standard set forth under *Gonzaga University* controls and that the plaintiffs cannot meet that standard.

In *Gonzaga University* v. *Doe*, supra, 536 U.S. 276, the Supreme Court addressed the *Blessing* factors when considering whether a student may sue a private university for damages under § 1983 to enforce provisions of the Family Educational Rights and Privacy Act of 1974; 20 U.S.C. § 1232g; which prohibit the federal funding of educational institutions that have a policy or practice

---

[21] The factors for analyzing § 1983 claims under *Blessing* v. *Freestone*, supra, 520 U.S. 340–41, are as follows: "First, Congress must have intended that the provision in question benefit the plaintiff. . . . Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. . . . Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." (Citations omitted.)

of releasing education records to unauthorized persons. The court stated that, "[s]ome language in [previous Supreme Court] opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983. *Blessing*, for example, set forth three factors to guide judicial inquiry into whether or not a statute confers a right: Congress must have intended that the provision in question benefit the plaintiff, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence, and the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. . . . In the same paragraph, however, *Blessing* emphasizes that it is only violations of rights, not laws, which give rise to § 1983 actions. . . . This confusion has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action. . . .

"We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of rights, privileges, or immunities secured by the [c]onstitution and laws of the United States. Accordingly, it is rights, not the broader or vaguer benefits or interests, that may be enforced under the authority of that section."[22] (Citations omitted; internal quotation marks

---

[22] Despite the broad sweep of the court's discussion in *Gonzaga University*, the plaintiffs rely on the court's preceding discussion of its spending power cases and claim that the "unambiguously conferred right" requirement applies only to § 1983 enforcement of statutes that were enacted pursuant to Congress' spending power. In support, the plaintiffs cite two federal District Court cases concluding that § 3608 provided an implied cause of action enforceable under § 1983: *Langlois* v. *Abington Housing Authority*,

omitted.) Id., 282–83; accord *Rancho Palos Verdes* v. *Abrams*, 544 U.S. 113, 119–20, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005) (The Supreme Court stated that its cases have "made clear . . . that § 1983 does not provide an avenue for relief every time a state actor violates a federal law. As a threshold matter, the text of § 1983 permits the enforcement of *rights*, not the broader or vaguer benefits or interests." [Emphasis in original; internal quotation marks omitted.]).[23]

234 F. Sup. 2d 33, 71–75 (D. Mass. 2002) (concluding that private cause of action exists under § 3608 after applying *Blessing* analysis); *Wallace* v. *Chicago Housing Authority*, 298 F. Sup. 2d 710, 719 (N.D. Ill. 2003) (agreeing with *Langlois* analysis). In *Langlois*, the District Court followed the broader benefits based analysis of the *Blessing* test rather than the rights based focus applied in *Gonzaga University* because the directive in § 3608 "to affirmatively further" fair housing "is [part of] a civil rights statute focused on ensuring individual rights to fair housing. Its obligations are not ancillary to a federal-state spending contract." *Langlois* v. *Abington Housing Authority*, supra, 74. Although the court's observation of the distinction between the statutory schemes is accurate, we do not find its reasoning persuasive.

In *Gonzaga University*, the Supreme Court did not indicate that its holding was limited to statutes enacted pursuant to the spending clause. Indeed, as we have noted, it expressly acknowledged the "confusion" in the interpretation by lower courts of *Blessing*, which led to a general zone of interest analysis, and then explicitly "reject[ed] the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Gonzaga University* v. *Doe*, supra, 536 U.S. 283. Thereafter, in a case implicating a statute that was not enacted under Congress' spending power, the Supreme Court cited to its emphasis in *Gonzaga University* on unambiguously conferred rights versus benefits and neither indicated a limitation on *Gonzaga University* to spending clause cases, nor referenced a separate test for different types of statutes. See *Rancho Palos Verdes* v. *Abrams*, 540 U.S. 113, 119–20, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005). We further note that the distinction suggested by the plaintiffs has been rejected explicitly or implicitly by federal circuit courts. See *McCready* v. *White*, 417 F.3d 700, 703 (7th Cir. 2005) ("Any possibility that *Gonzaga [University]* is limited to statutes that rest on the spending power [as the law in that case did] has been dispelled by *Rancho Palos Verdes* v. *Abrams*, [supra, 119–20], which treats *Gonzaga [University]* as establishing the effect of § 1983 itself. Thus we must ask whether [18 U.S.C.] § 2721 [b] creates person-specific rights . . . .").

[23] In *Rancho Palos Verdes* v. *Abrams*, supra, 544 U.S. 121 the parties had agreed that 47 U.S.C. § 332 (c) (7), a provision of the Communications Act of 1934, created an individually enforceable right, and thus the court's

Accordingly, the court held that to sustain a § 1983 action, the plaintiff must demonstrate that the federal statute unambiguously confers an individually enforceable right on the class of beneficiaries to which the plaintiff belongs.[24] *Gonzaga University* v. *Doe,* supra, 536 U.S. 283–84. The court then confirmed that, "[t]he question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class. *Touche Ross & Co.* v. *Redington,* [supra, 442 U.S. 576]. For a statute to create such private rights, its text must be phrased in terms of the persons benefited. *Cannon* v. *University of Chicago,* 441 U.S. 677 [690–92 n.13, 99 S. Ct. 1946, 60 L. Ed. 2d 560] (1979)." (Internal quotation marks omitted.) *Gonzaga University* v. *Doe,* supra, 283–84. As examples of statutes that are phrased with an unmistakable focus on the benefited class, the court pointed to instances in which it previously had recognized an individually

discussion of the applicable standard for making such a determination essentially was dicta.

[24] In *Gonzaga University* v. *Doe,* supra, 536 U.S. 285, the court noted that this rights based requirement was the same irrespective of whether a plaintiff sought to bring an implied right of action directly under the statute allegedly violated or under that statute through § 1983. The court observed that there was a distinction in the ultimate burden of proof, however, because "[p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." Id., 284.

Even after a plaintiff has demonstrated that the statute creates an enforceable right, however, "there is only a rebuttable presumption that the right is enforceable under § 1983. . . . The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right. . . . [E]vidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983. . . . The crucial consideration is what Congress intended." (Citations omitted; internal quotation marks omitted.) *Rancho Palos Verdes* v. *Abrams,* supra, 544 U.S. 120. Because we conclude § 3608 (d) does not create an individually enforceable right, we do not address whether the presumption created in favor of § 1983 enforcement would be rebuttable.

enforceable cause of action under statutes providing that "[n]o *person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving [f]ederal financial assistance on the basis of race, color, or national origin" or that "[n]o *person* in the United States *shall*, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." (Emphasis in original; internal quotation marks omitted.) Id., 284 n.3, citing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (a).[25]

Applying this analysis, the court in *Gonzaga University* considered whether the plaintiff, a former student at the defendant private university, could bring an action for damages under the Family Educational Rights and Privacy Act of 1974 for the university's disclosure

---

[25] The court in *Gonzaga University* v. *Doe*, supra, 536 U.S. 284 and n.3, cited *Cannon* v. *University of Chicago*, supra, 441 U.S. 690–91 n.13, which provided other examples of statutory language conferring a right directly on a class of persons that included the plaintiff in that particular case: "*Sullivan* v. *Little Hunting Park*, 396 U.S. 229, 238 [90 S. Ct. 400, 24 L. Ed. 2d 386 (1969)] (42 U.S.C. § 1982: *All citizens* of the United States *shall* have the same right . . . as is enjoyed by white citizens thereof . . .); *Allen* v. *State Board of Elections*, 393 U.S. 544 [89 S. Ct. 817, 22 L. Ed. 2d 1 (1969)] (42 U.S.C. § 1973c: *no person shall* be denied the right to vote . . .) . . . *Tunstall* v. *Locomotive Firemen & Enginemen*, 323 U.S. 210, 213 [65 S. Ct. 235, 89 L. Ed. 187 (1944)] (§ 2 Fourth of the Railway Labor Act: *Employees shall* have the right to organize and bargain collectively through representatives . . .) . . . *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U.S. 548, [567–70, 50 S. Ct. 427, 74 L. Ed. 1034 (1930)] (§ 2 Third of the Railway Labor Act: *Representatives* . . . *shall* be designated by the respective parties . . . without interference, influence, or coercion exercised by either party . . .); *Texas & Pacific R. Co.* v. *Rigsby*, 241 U.S. 33, 40 [36 S. Ct. 482, 60 L. Ed. 874 (1916)] (27 Stat. 532; *any employee* of any such common carrier). Analogously, the [c]ourt has implied causes of action in favor of the United States in cases where the statute creates a duty in favor of the public at large. See *Wyandotte Transportation Co.* v. *United States*, 389 U.S. 191, 200–202 [88 S. Ct. 379, 19 L. Ed. 2d 407 (1967)] (33 U.S.C. § 409: It *shall not be lawful* [to obstruct navigable waterways]) . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.)

of information in the plaintiff's records. *Gonzaga University* v. *Doe*, supra, 536 U.S. 276. The statute at issue provided in relevant part: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of their parents to any individual, agency, or organization . . . ." 20 U.S.C. § 1232g (b) (1). The court determined that this provision speaks "only to the Secretary of Education, directing that [n]o funds shall be made available to any educational agency or institution which has a prohibited policy or practice. . . . This focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of individual entitlement that is enforceable under § 1983." (Citation omitted; internal quotation marks omitted.) *Gonzaga University* v. *Doe*, supra, 287.

The court therein also noted that the statute was similar to the one at issue in *Blessing* v. *Freestone*, supra, 520 U.S. 343, wherein it had determined that the plaintiff mothers could not assert § 1983 enforcement of Title IV-D of the Social Security Act requiring states receiving federal child welfare funds to " 'substantially comply' " with requirements designed to ensure timely payment of child support. *Gonzaga University* v. *Doe*, supra, 536 U.S. 281–82. In rejecting the claim before it, the *Gonzaga University* court, consistent with its explanation of *Blessing*, reasoned that "[f]ar from creating an *individual* entitlement to services, the standard [set by the statute under consideration] is simply a yardstick . . . to measure the *systemwide* performance of [the] program . . . [and the authority charged with overseeing the program thus] must look to the aggregate services provided . . . not to whether the needs of any particular person have been satisfied."

(Emphasis in original; internal quotation marks omitted.) Id., quoting *Blessing* v. *Freestone*, supra, 343.

Turning to the case at hand, we now apply to § 3608 (d) the standard set forth in *Gonzaga University*, requiring an unambiguously conferred right. Section 3608, entitled "Administration," is part of the Fair Housing Act, 42 U.S.C. § 3601 et seq., which Congress enacted as Title VIII of the Civil Rights Act of 1968. See *NAACP*, *Boston Chapter* v. *Pierce*, 624 F. Sup. 1083, 1084, 1088 (D. Mass. 1985), vacated on other grounds, 817 F.2d 149 (1st Cir. 1987). The congressional purpose in enacting the Fair Housing Act generally was "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Subsection (d) of § 3608 essentially mirrors that purpose, requiring that "[a]ll executive departments and agencies shall administer their programs and activities relating to housing and urban development . . . in a manner affirmatively to further the [fair housing] purposes of this subchapter . . . ." 42 U.S.C. § 3608 (d).[26]

The defendant's obligation under § 3608 (d) "affirmatively to further" the purposes of the fair housing statutes does not create an unambiguous right vested in the plaintiffs. The statutory language is not a directive to benefit the public generally with respect to a specific right, as in "all persons shall have the right to fair housing," nor is it a prohibition on certain acts against the public, as in "no person shall be denied access to fair housing by housing agencies." Compare statutory language in cases cited in footnote 25 of this opinion. Rather, § 3608 (d) is directed at executive departments and agencies regarding the administration of their pro-

---

[26] Although the phrase "executive departments and agencies" is not defined in the Fair Housing Act, the defendant does not claim that the phrase is inapplicable to state agencies, and thus, we assume, for the purposes of this opinion, that the phrase includes state housing authorities, such as the finance authority in the present case.

grams and activities. Like the statutory language at issue in *Gonzaga,* this administrative focus is two steps removed from the interests of the plaintiffs and, therefore, does not confer the sort of individual entitlement that is enforceable under § 1983. Indeed, § 3608 (d) imposes a duty to consider "the aggregate services provided by the [state agency], not to whether the needs of any particular person have been satisfied." (Internal quotation marks omitted.) *Gonzaga University* v. *Doe,* supra, 536 U.S. 281–82. Accordingly, we conclude that the plaintiffs have failed to demonstrate that § 3608 (d) creates an unambiguous individually enforceable right that may be brought under § 1983.[27]

### B

The plaintiffs also claim that 26 C.F.R. § 1.42-9, a tax regulation incorporating fair housing rules, provides a

---

[27] Moreover, in the subchapter in which the administrative requirements of § 3608 are situated, Congress provided in other sections language declaring unlawful specific discriminatory housing practices. See 42 U.S.C. § 3604 (unlawful to discriminate in sale or rental of housing); 42 U.S.C. § 3605 (unlawful to discriminate in residential real estate transactions); 42 U.S.C. § 3606 (unlawful to discriminate in provision of brokerage services); 42 U.S.C. § 3617 (unlawful to coerce, intimidate, threaten, or interfere with exercise of "any right granted or protected by these sections"); see also 42 U.S.C. § 3602 (f) (limiting discriminatory housing practice to those in §§ 3604, 3605, 3606 and 3617). Notably, although § 3617 bars interference with "rights" conferred under certain provisions, § 3608 is not one of the enumerated provisions.

Furthermore, our conclusion that § 3608 does not create an unambiguous right is buttressed by the "multifaceted enforcement scheme expressly set out in the statute. First, Congress explicitly created a judicial remedy for discrimination in the sale, rental, financing or brokerage of housing as prohibited by sections 3603, 3604, 3605 and 3606 of Title VIII. 42 U.S.C. § 3612 (a). Second, Title VIII provides for the filing of complaints with the Secretary [of Housing and Urban Development], which may lead to a civil suit by the complainant against the fund recipient if voluntary compliance is not obtained within thirty days. [42 U.S.C. §] 3610 (a)–(d). Finally, Title VIII also provides that the Attorney General may bring suit to challenge a pattern or practice of discrimination. [42 U.S.C. §] 3613. In view of these provisions, it is unlikely that Congress absentmindedly forgot to mention an intended private action against [the government agency] under section 3608 (d)." (Internal quotation marks omitted.) *Latinos Unidos De Chelsea*

separate basis for a § 1983 claim. See footnote 4 of this opinion. They acknowledge, however, that the United States Supreme Court's holding in *Alexander* v. *Sandoval*, 532 U.S. 275, 284, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001), precludes enforcement of the regulation at issue unless it is based on a statute that in and of itself creates enforceable rights. Because we have concluded that 42 U.S.C. § 3608 (d) is not enforceable pursuant to § 1983, we also must conclude that 26 C.F.R. § 1.42-9, to the extent it is based on § 3608 (d), is not enforceable pursuant to § 1983.[28]

The judgment is affirmed.

In this opinion the other justices concurred.

---

*En Accion* v. *Secretary of Housing & Urban Development*, 799 F.2d 774, 792–93 (1st Cir. 1986).

[28] In reliance on their position that they can enforce § 3608 and § 1.42-9 through § 1983, the plaintiffs appear to have abandoned the claim they asserted before the trial court that they also may bring a direct cause of action under § 3608 because Congress intended for that statute to create an implied private right of action. Accordingly, we do not consider that issue. We note, however, the court's observation in *Gonzaga University* v. *Doe*, supra, 536 U.S. 285, that a "court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." Thus, it is unclear how the plaintiffs could prevail independent of § 1983.