CONNECTICUT INSURANCE GUARANTY
ASSOCIATION *v.* STATE OF
CONNECTICUT ET AL.
(SC 17538)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued January 6—officially released May 9, 2006

*Mark D. Robins*, pro hac vice, with whom were *Charles W. Pieterse* and, on the brief, *Joseph C. Tanski*, pro hac vice, for the appellant (plaintiff).

*Yinxia Long*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney gen-

eral, and *William J. McCullough*, assistant attorney general, for the appellee (named defendant).

*Opinion*

NORCOTT, J. It is well settled that the plaintiff, the Connecticut Insurance Guaranty Association (association), is not obligated to pay claims that are asserted for the benefit of an insurer, because such unpaid claims are not "covered claims" under the Connecticut Insurance Guaranty Association Act (act), General Statutes § 38a-836 et seq. See, e.g., *Doucette* v. *Pomes*, 247 Conn. 442, 454–55, 724 A.2d 481 (1999). The association appeals[1] from the declaratory judgment of the trial court rendered for the named defendant, the state of Connecticut (state), and claims that the trial court improperly concluded that the state's claims became " '[c]overed claim[s],' "[2] as defined in General Statutes § 38a-838 (5), that no longer were for the benefit of an insurer after the state's indemnity insurer had executed a waiver of its contractual right to reimbursement through subrogation recoveries, including payments by the association to the state. We affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. On April 10, 1997, Traci Carello, who had been discharged that day as a patient from the Elmcrest Psychiatric Institute (Elmcrest), and Karen Gagliardi, a state employee, were involved in an automobile accident. Both Carello and Gagliardi were Con-

---

[1] The association appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] " 'Covered claim' means an unpaid claim, including, but not limited to, one for unearned premiums, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and . . . the term 'covered claim' shall not include . . . any claim by or for the benefit of any reinsurer, insurer, insurance pool, or underwriting association . . . ." General Statutes § 38a-838 (5) (B) (i).

necticut residents. Gagliardi sustained personal injuries as a result of the accident and thereafter brought an action against both Carello and Elmcrest in the Superior Court for the judicial district of Hartford (underlying action). At the time of the accident, Elmcrest was insured by Credit General Insurance Company (Credit General), which subsequently was determined to be insolvent by a court of competent jurisdiction. The state, which was, at the time, self-insured for the purposes of workers' compensation, had paid Gagliardi benefits in the amount of $195,757.35, and intervened in the underlying action to recover that expenditure from Elmcrest pursuant to General Statutes § 31-293 (a).[3]

Due to Credit General's insolvency, the association became obliged to pay "covered claims" under Elmcrest's policy pursuant to General Statutes § 38a-841.[4] The state subsequently obtained a "workers' compensation self-insurer's indemnity policy" (policy) from the Illinois Union Insurance Company (Illinois Union), which became effective on November 16, 2001. Pursuant to the terms of the policy, " 'all claim reimbursements, including, but not limited to subrogation recoveries, will be credited to [Illinois Union] on a pro-rata basis (whereby [the state] will get credit for claim reimbursements approved prior to [November 16, 2001], but not paid or received until after [November 16, 2001], and [Illinois Union] shall be entitled to all other recoveries).' "

---

[3] General Statutes § 31-293 (a) provides in relevant part: "[A]ny employer . . . having paid, or having become obligated to pay, compensation under the provisions of this chapter may bring an action against [a tortfeasor who had injured an employee] to recover any amount that he has paid or has become obligated to pay as compensation to the injured employee. . . ."

[4] General Statutes § 38a-841 (1) (a) provides in relevant part: "[The] association shall . . . [b]e obligated to the extent of the covered claims existing prior to the determination of insolvency and arising within thirty days after the determination of insolvency . . . ."

The association had not approved the state's $195,757.35 claim as of November 16, 2001, and, upon learning of the policy, it asserted that it was not obliged to do so because the claim was for the benefit of an insurer and, therefore, was not a "covered claim" within the meaning of § 38a-838 (5). See footnote 2 of this opinion. On August 5, 2002, the association commenced the present action, seeking a declaratory judgment that it had no obligation to pay the state's claim. The state and Illinois Union subsequently executed an amendment to the policy whereby Illinois Union waived any claim for payment of funds recovered by the state in the underlying action.[5]

The parties filed a statement of stipulated facts, and the case was tried to the court, which concluded that, because of the waiver, the funds at issue were not for the benefit of an insurer and were, therefore, recoverable under the act. This appeal followed.

On appeal, the association claims, inter alia, that the trial court improperly concluded that, because of the waiver, it was obligated to pay the state's claim, arguing that: (1) in asserting its claim for reimbursement, the state is standing in Illinois Union's shoes and, therefore, is asserting a barred claim on behalf of its insurer; (2) construction of the act as allowing the state's claim contravenes its legislative history and purpose; and (3) cases from other jurisdictions support its position that waivers like the one herein do not restore a claim's compensable status. The state, in response, contends that the waiver restored the status of its claim as a

---

[5] The waiver provides in relevant part: "[Illinois Union] on behalf of itself and the member companies of the ACE Group of [i]nsurance and [r]einsurance [c]ompanies hereby irrevocably waives any claim for subrogation recovery or reimbursement from [the state] from sums it may receive from [the association] in connection with [the underlying action]. Per agreement of the parties . . . this waiver shall constitute an amendment to the [p]olicy [effective the policy's effective date]."

"covered claim" as defined by the act, which does not prohibit the restoration of a claim by a waiver of an insurer's interest therein. We agree with the state.

At the outset, we set forth the applicable standard of review. Because the association and the state have stipulated to the relevant facts, the question before us solely is one of statutory interpretation and "our review is plenary and we must determine whether the trial court's conclusions of law are legally and logically correct and find support in the stipulated facts." (Internal quotation marks omitted.) *Doucette* v. *Pomes*, supra, 247 Conn. 453.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Citation omitted; internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005).

Accordingly, we begin our inquiry with the language of the applicable statutes. Section 38a-841 (1) (a) pro-

vides in relevant part that the association "shall . . . [b]e obligated to the extent of the *covered claims* existing prior to the determination of insolvency and arising within thirty days after the determination of insolvency . . . ." (Emphasis added.) " 'Covered claim' means an unpaid claim, including, but not limited to, one for unearned premiums, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply . . . provided the term 'covered claim' *shall not include (i) any claim by or for the benefit of any reinsurer, insurer, insurance pool, or underwriting association,* as subrogation recoveries or otherwise . . . ." (Emphasis added.) General Statutes § 38a-838 (5) (B). The association does not dispute that the claim at issue in the present case "arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply"; General Statutes § 38a-838 (5); but rather, it contends that the status of the state's claim as one for the benefit of an insurer *before* execution of the waiver by Illinois Union cannot be restored by agreement of the parties, despite the fact that Illinois Union no longer is entitled to receive any funds recovered in the present case.

Resolution of the present case, therefore, turns on the meaning of the statutory phrase "for the benefit of [an] . . . insurer"; General Statutes § 38a-838 (5) (B) (i); which is ambiguous as to the effect of waivers on the status of a claim. Although the word "benefit" is not defined in the act, it is axiomatic that "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly . . . ." General Statutes § 1-1 (a). Accord-

ingly, "[i]f a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." *State* v. *Indrisano,* 228 Conn. 795, 809, 640 A.2d 986 (1994).

The American Heritage Dictionary (4th Ed. 2000) defines "benefit" as "[s]omething that promotes or enhances well-being; an advantage . . . ." Similarly, Black's Law Dictionary (6th Ed. 1990) defines the word "benefit" as an "[a]dvantage; profit; fruit; privilege; gain; interest. The receiving as the exchange for promise some performance or forbearance which promisor was not previously entitled to receive." Plainly, since the execution of the waiver, Illinois Union does not stand to receive any benefit in the present case. Furthermore, at the time the state intervened in the underlying action to recoup the funds it had paid in workers' compensation benefits, it was self-insured.[6] Only after the commencement of the underlying action did the state procure its workers' compensation self-insurer's indemnity policy. Thus, it is clear that, prior to November 16, 2001, the effective date of the policy, the state's claim was *not* for the benefit of an insurer and was, therefore, properly reimbursable by the association. The waiver, therefore, clearly was intended to restore the state's right to this claim to its prepolicy status.

Accordingly, the association's argument that, upon execution, the state's agreement with Illinois Union took on the immutable characteristic of being for the benefit of an insurer stands at odds with Connecticut's strong public policy favoring freedom of contract. "It is established well beyond the need for citation that parties are free to contract for whatever terms on which

---

[6] This court previously has concluded, and the parties do not dispute, that a self-insurer is not an "insurer" for the purposes of the act and may, therefore, recover from the association. *Doucette* v. *Pomes,* supra, 247 Conn. 474.

they may agree." *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 755, 628 A.2d 1298 (1993). It is equally well established that, "[t]he parties to any contract, if they continue interested and act upon a sufficient consideration while it remains executory, may by a new and later agreement rescind it in whole or in part, alter or modify it in any respect, add to or supplement it, or replace it by a substitute." (Internal quotation marks omitted.) *Vachon* v. *Tomascak*, 155 Conn. 52, 56, 230 A.2d 5 (1967). Indeed, the association cites no authority for the draconian proposition that the act precludes contracting parties from clarifying or modifying their obligations under agreements that they previously had entered, even if those contracts pertain to insurance.

The association also contends that giving the waiver this effect contravenes the legislature's intent to conserve the association's limited resources. In support of this contention, the association relies on General Statutes §§ 38a-841 and 38a-845, which provide, inter alia, that: (1) the association obtains its operating budget by making assessments on firms that provide insurance within Connecticut; General Statutes § 38a-841 (1) (c); (2) an insurer against which an assessment is made may offset the assessment against its tax liability to the state; General Statutes § 38a-841 (3) (A); and (3) persons having claims for reimbursement must exhaust their rights under solvent insurance policies before pursuing their claim against the association. General Statutes § 38a-845 (1). The association's argument, however, recognizes only one side of the coin.

Although the association correctly states that it is a nonprofit entity whose resources are to be distributed carefully, this court previously has recognized that "[t]he association was established for the purpose of providing a limited form of protection for policyholders and claimants in the event of insurer insolvency." *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 451, 705

A.2d 1012 (1997). The association's statutory mandate, and sole reason for existence, is to provide compensation for those whose remedy otherwise would be thwarted by insurer insolvency. *Doucette* v. *Pomes*, supra, 247 Conn. 459–60; see also General Statutes § 38a-841 (1) (a) ("[the] association shall . . . [b]e obligated to the extent of the covered claims existing prior to the determination of [insurer] insolvency and arising within thirty days after the determination of insolvency"). Additionally, the legislature has accounted for the possibility that the association might, at times, incur substantial liability. See General Statutes § 38a-841 (1) (c) ("[i]f the maximum assessment, together with the other assets of said association in any account, does not provide in any one year in any account an amount sufficient to make all necessary payments from that account, the funds available may be prorated and the unpaid portion shall be paid as soon thereafter as funds become available"). Accordingly, although the present case involves an unusual factual scenario, it does not thwart the legislature's express mandate that the association's resources be preserved. In fact, the association's *primary* purpose, the reimbursement of claims made against failed insurers, certainly is served by affording the state recovery in the present case, where, but for reimbursement, the state's claim would go unsatisfied due to insurer insolvency.

The association further argues that the trial court's conclusion lacks support in the act's legislative history. We disagree. Although the act is ambiguous as to the effect of the waiver in the present case, the act's legislative history reveals its protective nature and supports our conclusion that the trial court properly concluded that the waiver had restored the status of the state's claim as a "covered claim." The act was enacted in response to a growing national problem of insurer insolvency, which had caused great hardship for many peo-

ple as meritorious claims went uncompensated. See Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1971 Sess., pp. 55–59, testimony of Peter Kelly, member of Connecticut insurance department ("In the late 1960's . . . [c]onsumers were being hurt and on a personal scale, an insolvency can be ruinous. . . . [The Connecticut insurance department] in looking at companies can detect trends in companies that are being mismanaged, but [it] cannot detect and prevent [large-scale fraud]. The Connecticut [insurance department] cannot prevent disasters such as . . . forest fires, hurricanes . . . and other natural disasters which may cause a smaller insurance company to close its doors. . . . [The Connecticut insurance department] take[s] pride in [its] record of . . . protecting Connecticut residents from insolvent insurance companies, but [it is] not infallible and [it] want[s] to . . . see that if [it] make[s] an error in judgment, Connecticut residents will not suffer a financial loss."). Although the association is a nonprofit entity whose resources must be carefully protected; see General Statutes §§ 38a-838 (7) and 38a-839; it is clear that it exists to benefit the public in the case of insurer insolvency. Clearly, therefore, the state's claim in the present case falls squarely within the parameters contemplated by the legislature for reimbursement by the association.

Finally, the association urges us to follow several cases from other jurisdictions that it contends stand for the proposition that waivers, like the one in the present case, cannot have an effect on the association's obligations. Citing *Besack* v. *Rouselle Corp.*, 706 F. Sup. 385 (E.D. Pa. 1989), the association contends that, in the present case, the state, by virtue of the waiver, is, in essence, asserting the rights of an insurer to association reimbursement in violation of § 38a-838 (5). In *Besack*, the plaintiff, a factory worker and Pennsylvania resident, was injured while using a punch press machine

in the course of his employment. Id. After receiving $68,374.93 in workers' compensation payments from his employer's insurance company, the plaintiff brought an action against the manufacturer of the punch press, which was located in Illinois. Id. The plaintiff settled his claim with the manufacturer for $300,000. Id., 385–86. The manufacturer's insurance company, however, was declared insolvent, so the Illinois Insurance Guaranty Fund paid the plaintiff its statutory maximum sum of $150,000. Id., 386. The plaintiff then sought recovery from the Pennsylvania Insurance Guaranty Association (Pennsylvania association), receiving from it $81,525.07, the unpaid balance of his $300,000 settlement. Id. The workers' compensation carrier of the plaintiff's employer waived its claim for reimbursement of the $68,374.93 that it had paid in workers' compensation benefits, and the plaintiff then personally attempted to assert it. Id.

The plaintiff brought an action against the Pennsylvania association, claiming that it was not entitled to offset its payment to him by the $68,374.93 that he had received from his employer's insurance company; rather, he claimed, it was required to pay him a total of $149,900.[7] Id. The Pennsylvania statute, which is structured similarly to our act, expressly excluded from the definition of "covered claim" "any amount due any insurer . . . [or] as a subrogation recovery . . . ." 40 Pa. Cons. Stat. Ann. (Rev. to 1989) § 1701.103 (5) (b). In concluding that the plaintiff was not entitled to recover the $68,374.93, the United States District Court for the Eastern District of Pennsylvania reasoned that "[the employer's insurer's] election to waive its claim for subrogation does not change the legal nature of the claim. [The plaintiff] cannot now assert, in effect, [the

---

[7] We note that $149,900 represented the total amount of the settlement less a $100 deductible, and the $150,000 contributed by the Illinois Insurance Guaranty Fund. *Besack* v. *Rouselle Corp.*, supra, 706 F. Sup. 386.

employer's] subrogation claim and avoid the application of § 1701.103 (5) (b). If he were able to do so, [the plaintiff] would be able to recover more money than he could have if [the manufacturer's insurance company] had remained solvent."[8] *Besack* v. *Rouselle Corp.*, supra, 706 F. Sup. 387.

The present case, unlike *Besack*, involves no attempt to exercise an *insurer's* claim for reimbursement. Illinois Union has made no claim for reimbursement from the association, nor has it sought to transfer such a claim. Rather, its sole claim was to payment from the state. Accordingly, the state has not, as the association contends, " 'assert[ed], in effect, [the insurer's] subrogation claim,' " but merely has altered its obligations with respect to the proceeds of *its own* proper claim for reimbursement from the association.

The association also relies heavily on three sister state cases that it contends stand for the proposition that waivers such as the one in the present case impermissibly circumvent statutory provisions intended to safeguard insurance guaranty association funds, namely, *Ventulett* v. *Maine Ins. Guaranty Assn.*, 583 A.2d 1022, 1024 (Me. 1990), *Ferrari* v. *Toto*, 9 Mass. App. 483, 484, 402 N.E.2d 107 (1980), aff'd, 383 Mass. 36, 39, 417 N.E.2d 427 (1981), and *Proios* v. *Bokeir*, 72 Wash. App. 193, 203, 863 P.2d 1363 (1993). All three cases are distinguishable from the present case.[9]

In *Ferrari*, the court concluded that a litigant could not bring a claim against the Massachusetts Insurer's

---

[8] The court in *Besack* also concluded that the plaintiff's claim did not meet the definition of a covered claim because it was not an unpaid claim arising from the insurance policy of an insolvent insurer. *Besack* v. *Rouselle Corp.*, supra, 706 F. Sup. 386.

[9] The association also relies on the per curiam opinion of the Massachusetts Appeals Court in *Kinney* v. *Leaman*, 14 Mass. App. 926, 926–27, 436 N.E.2d 996 (1982), concluding that *an assignee of an insurer's* subrogation claim had no rights against the Massachusetts Insurer's Insolvency Fund because he merely was asserting an insurer's barred claim. This case, like *Besack*, also clearly is distinguishable from the present matter.

Insolvency Fund when, by statute, the entire amount sought was to be paid to the plaintiff's workers' compensation provider, who, unlike the state's insurer in the present case, *did not* execute a waiver of subrogation. *Ferrari* v. *Toto*, supra, 9 Mass. App. 484–85. *Ferrari*, therefore, clearly is distinct from the present case, wherein the state's insurer expressly waived its right to subrogation proceeds.

In *Proios*, the plaintiff was involved in an automobile accident and sued the defendant for personal injuries that she had sustained. *Proios* v. *Bokeir*, supra, 72 Wash. App. 195–96. The defendant's insurer was declared insolvent, so the plaintiff recovered a portion of her damages from her own underinsured motorist policy and sought further recovery from the Washington Insurance Guaranty Association (Washington association). Id. Because the Washington statute, like our act, prohibits insurers from recovering under it, the plaintiff's insurer waived its right to subrogation. Id., 196. Nevertheless, the Washington association offset the benefits it had paid the plaintiff by the amount she recovered from her own insurer. Id. The court in *Proios*, construing the Washington statute's nonduplication of recovery provision; Wash. Rev. Code Ann. § 48.32.100 (1); concluded that the Washington association's offset was proper and prevented the plaintiff from being doubly compensated for her injuries.[10] In the present case, far from recovering double compensation, the state has recouped *none* of the funds it paid in workers' compensation benefits. Plainly, therefore, *Proios* is not informative in the present case, which does not implicate our

---

[10] Although the plaintiff in *Proios* also argued that she did not seek double recovery because, had the defendant's insurer been solvent and her insurer still waived subrogation, she would be entitled to collect the full amount of her damages from the defendant's insurer, the court disagreed. *Proios* v. *Bokeir*, supra, 72 Wash. App. 202–204. It reasoned that, had the Washington association not been involved in the case, the plaintiff's insurer would not have waived its right to subrogation and, accordingly, concluded that the plaintiff was put in no worse a position than she would have been in had the defendant's insurer been solvent. Id., 204.

act's prohibition of double recovery; see General Statutes § 38a-845 (1) ("Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer . . . shall exhaust first his rights under such policy. Any amount payable [under the act] shall be reduced by the amount recoverable under the claimant's insurance policy . . . ."). Rather, this case concerns construction of the term "covered claim." Similarly, *Ventulett*, in which the Maine Supreme Judicial Court construed the provisions of the Maine Insurance Guaranty Association Act on exhaustion of rights under solvent insurance policies and nonduplication of recovery; Me. Rev. Stat. Ann. tit. 24-A, § 4443 (1); also is inapposite. See *Ventulett* v. *Maine Ins. Guaranty Assn.*, supra, 583 A.2d 1024.

Accordingly, because, following execution of the waiver, the state's claim squarely fits within the act's definition of the term " '[c]overed claim' "; General Statutes § 38a-838 (5); and, because nothing in the act's text or history prohibits the state and Illinois Union from modifying their private obligations, the trial court properly concluded that the waiver restored the status of the state's claim as a "covered claim" and rendered a declaratory judgment in the state's favor.[11]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[11] The association also raises two other claims, which we do not reach because they are meritless. Indeed, we find puzzling the association's contention that "[t]here was nothing for Illinois Union to waive when it executed the purported waiver on September 30, 2002," because it possessed no right to any moneys received from the association. If, as the association contends, Illinois Union could not waive its right to the funds because it never possessed the right in the first place, then the original provision in the policy calling for payment to Illinois Union is void ab initio. This circular argument mischaracterizes the nature of the waiver. Illinois Union itself did not assert a claim against the association, nor did it purport to waive any claim against it. Rather, Illinois Union waived its valid contractual right to recover claim reimbursement funds from the state in the event that the state received them. The fact that, in the present case, the value of such reimbursement would be zero is immaterial.

Additionally, the association advances no meaningful support for its proposition that the imperative date for determining when a claim is for the benefit of an insurer is the date that it filed its declaratory judgment action, rather than the date upon which the judgment is entered in that proceeding. The two cases the association cites for the proposition that "the court normally determines the rights of the parties on the basis of the facts as they existed at the time the action was commenced," namely, *Bradbury* v. *Wodjenski*, 159 Conn. 366, 370, 269 A.2d 271 (1970), and *Avant Petroleum, Inc.* v. *Banque Paribas*, 853 F.2d 140, 143 (2d Cir. 1988), both involved the timing of perfection of security interests and are not relevant to the issue presented herein.