## ROBIN WALSH *v.* JEFFREY JODOIN
### (SC 17837)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued April 16—officially released July 17, 2007

Robert A. Nagy, assistant attorney general, with whom were Thomas P. Crean, assistant attorney general, and, on the brief, Richard Blumenthal, attorney general, for the appellant (state).

*Opinion*

NORCOTT, J. The sole issue in this appeal is whether Public Acts 2004, No. 04-100 (P.A. 04-100),[1] which

---

[1] Public Acts 2004, No. 04-100, provides in relevant part: "Section 1. Subdivisions (1) and (2) of subsection (a) of section 17b-745 of the general statutes, as amended by section 70 of public act 03-278, are repealed and the following is substituted in lieu thereof (Effective October 1, 2004):

"(a) (1) The Superior Court or a family support magistrate shall have authority to make and enforce orders for payment of support to the Commissioner of Administrative Services or, in IV-D support cases, to the state acting by and through the IV-D agency, directed to the husband or wife and, if the patient or person is [under twenty-one or, on and after October 1, 1972,] under the age of eighteen years or as otherwise provided in this subsection, to any parent of any patient or person being supported by the state, wholly or in part, in a state humane institution, or under any welfare program administered by the Department of Social Services, as the court or family support magistrate finds, in accordance with the provisions of subsection (b) of section 17b-179, or section 17a-90, 17b-81, 17b-223, 46b-129, as amended, or 46b-130, to be reasonably commensurate with the financial ability of any such relative. *If such person is unmarried, a full-time high school student and residing with the custodial parent, such support shall continue according to the parents' respective abilities, if such person is in need of support, until such person completes the twelfth grade or attains the age of nineteen, whichever first occurs.* Any court or family support magistrate called upon to make or enforce such an order, including one based upon a determination consented to by the relative, shall insure that such order is reasonable in light of the relative's ability to pay. . . .

"Sec. 2. Subdivisions (1) and (2) of subsection (a) of section 46b-171 of the general statutes are repealed and the following is substituted in lieu thereof (Effective October 1, 2004):

extended the parental obligation to support a child of

"(a) (1) If the defendant is found to be the father of the child, the court or family support magistrate shall order the defendant to stand charged with the support and maintenance of such child, with the assistance of the mother if such mother is financially able, as [said] the court or family support magistrate finds, in accordance with the provisions of subsection (b) of section 17b-179, or section 17a-90, 17b-81, 17b-223, 17b-745, as amended by this act, [subsection (b) of section 17b-179, section 17a-90,] 46b-129, as amended, 46b-130 or 46b-215, as amended by this act, to be reasonably commensurate with the financial ability of the defendant, and to pay a certain sum periodically until the child attains the age of eighteen years or as otherwise provided in this subsection. *If such child is unmarried, a full-time high school student and residing with the custodial parent, such support shall continue according to the parents' respective abilities, if such child is in need of support, until such child completes the twelfth grade or attains the age of nineteen, whichever first occurs.* The court or family support magistrate shall order the defendant to pay such sum to the complainant, or, if a town or the state has paid such expense, to the town or the state, as the case may be, and shall grant execution for the same and costs of suit taxed as in other civil actions, together with a reasonable attorney's fee; and may require the defendant to become bound with sufficient surety to perform such orders for support and maintenance. . . .

"Sec. 3. Subsections (b) and (c) of section 46b-172 of the general statutes are repealed and the following is substituted in lieu thereof (Effective October 1, 2004):

"(b) An agreement to support the child by payment of a periodic sum until the child attains the age of eighteen years or as otherwise provided in this subsection, together with provisions for reimbursement for past due support based upon ability to pay in accordance with the provisions of subsection (b) of section 17b-179, or section 17a-90, 17b-81, 17b-223, [subsection (b) of section 17b-179, section 17a-90,] 46b-129, as amended, or 46b-130, and reasonable expense of prosecution of the petition, when filed with[,] and approved by a judge of [said court] the Superior Court, or in IV-D support cases and matters brought under sections 46b-212 to 46b-213v, inclusive, a family support magistrate at any time, shall have the same force and effect, retroactively or prospectively in accordance with the terms of said agreement, as an order of support entered by [that] the court, and shall be enforceable and subject to modification in the same manner as is provided by law for orders of the court in such cases. *If such child is unmarried, a full-time high school student and residing with the custodial parent, such support shall continue according to the parents' respective abilities, if such child is in need of support, until such child completes the twelfth grade or attains the age of nineteen, whichever first occurs.* Past due support in such cases shall be limited to the three years next preceding the date of the filing of such agreements to support. Payments under such agreement shall be made to the petitioner, except that in IV-D support cases,

unmarried parents until that child either "completes

as defined in subsection (b) of section 46b-231, payments shall be made to the Bureau of Child Support Enforcement or its designated agency. Such written agreements to support shall be on forms prescribed by the Office of the Chief Court Administrator and shall be sworn to, and shall be binding on the person executing the same whether he is an adult or a minor.

"(c) At any time after the signing of any acknowledgment of paternity, upon the application of any interested party, the court or any judge thereof or any family support magistrate in IV-D support cases and in matters brought under sections 46b-212 to 46b-213v, inclusive, shall cause a summons, signed by such judge or family support magistrate, by the clerk of [said] the court or by a commissioner of the Superior Court, to be issued, requiring the acknowledged father to appear in court at a time and place as determined by the clerk but not more than ninety days after the issuance of the summons, to show cause why the court or the family support magistrate assigned to the judicial district in IV-D support cases should not enter judgment for support of the child by payment of a periodic sum until the child attains the age of eighteen years or as otherwise provided in this subsection, together with provision for reimbursement for past due support based upon ability to pay in accordance with the provisions of subsection (b) of section 17b-179, or section 17a-90, 17b-81, 17b-223, [subsection (b) of section 17b-179, section 17a-90,] 46b-129, as amended, or 46b-130, a provision for health coverage of the child as required by section 46b-215, as amended by this act, and reasonable expense of the action under this subsection. *If such child is unmarried, a full-time high school student and residing with the custodial parent, such support shall continue according to the parents' respective abilities, if such child is in need of support, until such child completes the twelfth grade or attains the age of nineteen, whichever first occurs.* Such court or family support magistrate, in IV-D support cases, shall also have the authority to order the acknowledged father who is subject to a plan for reimbursement of past-due support and is not incapacitated, to participate in work activities which may include, but shall not be limited to, job search, training, work experience and participation in the job training and retraining program established by the Labor Commissioner pursuant to section 31-3t. . . .

"Sec. 4. Subdivisions (1) and (2) of subsection (a) of section 46b-215 of the general statutes are repealed and the following is substituted in lieu thereof (Effective October 1, 2004):

"(a) (1) The Superior Court or a family support magistrate shall have authority to make and enforce orders for payment of support against any person who neglects or refuses to furnish necessary support to such person's spouse or a child under the age of eighteen or as otherwise provided in this subsection, according to such person's ability to furnish such support, notwithstanding the provisions of section 46b-37. *If such child is unmarried, a full-time high school student and residing with the custodial parent, such support shall continue according to the parents' respective abilities,*

the twelfth grade or attains the age of nineteen, whichever first occurs," applies retroactively to support orders already in effect at the time of that act's effective date of October 1, 2004. The plaintiff[2] state of Connecticut appeals[3] from the judgment of the trial court dismissing its appeal from the decision of the family support magistrate terminating the child support orders against the defendant, Jeffrey Jodoin,[4] retroactive to the eighteenth birthday of the minor child, Joshua Jodoin. Because P.A. 04-100 amended various family statutes to render the support available to a child of unmarried parents equal to that provided to a child whose parents have divorced, we conclude that the equal protection clause of the fourteenth amendment to the United States constitution requires us to construe P.A. 04-100 to apply retroactively. This entitles the minor child to support beyond his eighteenth birthday and, accordingly, we reverse the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The named plaintiff, Robin Walsh, is the mother of the minor child, who was born on November 8, 1986. The defendant is the acknowledged father of the minor child. In March, 1990, the state, which

---

*if such child is in need of support, until such child completes the twelfth grade or attains the age of nineteen, whichever first occurs. . . ."* (Emphasis added.)

[2] Pursuant to General Statutes § 46b-231 (t) (3) and (u) (1), the state is a party plaintiff on behalf of the named plaintiff, Robin Walsh. The state has appealed on behalf of support enforcement services; see General Statutes § 46b-207; which is acting on behalf of Walsh.

[3] The state appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] We note that the defendant did not participate in the proceedings before the trial court or file an appearance with the Appellate Court or this court. Accordingly, because the defendant failed to comply with our order requiring him to file a brief by December 27, 2006, this appeal will be considered on the state's brief and the record only.

had been providing public assistance to Walsh for the support of the minor child, applied to the court for a support order pursuant to General Statutes (Rev. to 1989) § 46b-172 (b).[5] The family support magistrate, *Katherine Y. Hutchinson*, granted the state's request and ordered the defendant to pay continuing support and arrearage to Walsh, as well as to provide medical and dental insurance at a reasonable cost for the minor child.

Thereafter, in November, 2004, the family support magistrate, *Harris T. Lifshitz*, granted the state's application and ordered the defendant to appear in January, 2005, to show cause why he should not be held in contempt of court for failure to comply with the court's previous orders in the case. In March, 2005, at a hearing held on that application, the support enforcement officer informed the court that, although the minor child had turned eighteen years of age, the state would continue to enforce the support order pursuant to P.A. 04-100 because he was still enrolled in high school.

[5] General Statutes (Rev. to 1989) § 46b-172 provides in relevant part: "(b) At any time after the filing with the court of any acknowledgment of paternity, upon the application of any interested party, the court or any judge thereof or any family support magistrate in IV-D support cases shall cause a summons, signed by him or by the clerk or assistant clerk or assistant clerk of the family support magistrate decision in IV-D support cases, of said court, to be issued, requiring the putative father to appear in court at a time and place named therein, to show cause, if any he has, why the court or the family support magistrate assigned to the judicial district in IV-D support cases should not enter judgment for support of the child by payment of a periodic sum until the child attains the age of eighteen years, together with provision for reimbursement for lying-in expense, accrued maintenance and reasonable expense of the action under this subsection on the acknowledgment of paternity previously filed with said court. The prior judgment as to paternity shall be res judicata as to that issue and shall not be reconsidered by the court, unless the person seeking review of the acknowledgment petitions the superior court for the judicial district having venue for a hearing on the issue of paternity within three years of such judgment or within three years of October 1, 1982, whichever is later. All such payments shall be made through the family relations office of the superior court."

Magistrate Lifshitz concluded, however, that the order had been terminated by operation of law on the minor child's eighteenth birthday on November 8, 2004. Accordingly, he refused to extend the order, and he ordered support enforcement services to modify or to adjust its records to reflect termination of the order as of November 8, 2004.

The state appealed from the decision of Magistrate Lifshitz to the trial court pursuant to General Statutes § 46b-231 (n).[6] On appeal, the state claimed that P.A.

[6] General Statutes § 46b-231 (n) provides in relevant part: "(1) A person who is aggrieved by a final decision of a family support magistrate is entitled to judicial review by way of appeal under this section.

"(2) Proceedings for such appeal shall be instituted by filing a petition in superior court for the judicial district in which the decision of the family support magistrate was rendered not later than fourteen days after filing of the final decision with an assistant clerk assigned to the Family Support Magistrate Division or, if a rehearing is requested, not later than fourteen days after filing of the notice of the decision thereon. In a IV-D support case, such petitions shall be accompanied by a certification that copies of the petition have been served upon the IV-D agency as defined in subsection (b) of this section and all parties of record. Service upon the IV-D agency may be made by the appellant mailing a copy of the petition by certified mail to the office of the Attorney General in Hartford. . . .

"(6) The appeal shall be conducted by the Superior Court without a jury and shall be confined to the record and such additional evidence as the Superior Court has permitted to be introduced. The Superior Court, upon request, shall hear oral argument and receive written briefs.

"(7) The Superior Court may affirm the decision of the family support magistrate or remand the case for further proceedings. The Superior Court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the decision of the family support magistrate is: (A) In violation of constitutional or statutory provisions; (B) in excess of the statutory authority of the family support magistrate; (C) made upon unlawful procedure; (D) affected by other error of law; (E) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"(8) Any order entered by the court pursuant to an appeal under this subsection may be retroactive to the date of the original order entered by the family support magistrate.

"(9) Upon all such appeals which are denied, costs may be taxed in favor of the prevailing party at the discretion of the Superior Court, but no costs shall be taxed against the state. . . ."

04-100 applies retroactively to extend support orders that already had been entered before the public act's effective date of October 1, 2004. Relying on this court's decision in *D'Eramo* v. *Smith*, 273 Conn. 610, 872 A.2d 408 (2005), and General Statutes § 55-3,[7] the trial court, *Swienton, J.*, concluded that P.A. 04-100 was a substantive change in the law that presumptively applied prospectively only. The trial court further concluded that there was nothing in the text or legislative history of P.A. 04-100 that indicated that the legislature had intended for the public act to apply retroactively, notwithstanding its purpose, which was to equalize the treatment of children in need of support, independent of their parents' marital status. Accordingly, the trial court rendered judgment dismissing the state's appeal.

Thereafter, the state moved for reargument, contending that the trial court's construction of P.A. 04-100 violated the equal protection clauses of the federal and state constitutions by providing a greater support benefit to the children of divorced parents than to children of unmarried parents. The trial court denied the motion for reargument. This appeal followed.

On appeal, the state claims that the trial court improperly concluded that P.A. 04-100 does not apply retroactively in light of the fact that the legislature had enacted it to create parity among all children entitled to support. The state also claims that the trial court's construction to the contrary violates the equal protection rights of children of unmarried parents by disadvantaging them compared to children of parents who were married when those children were born. Although we conclude

---

[7] General Statutes § 55-3 provides: "No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."

that there is insufficient evidence of the requisite legislative intent to justify retroactive application of this substantive law, we nevertheless conclude that P.A. 04-100 applies retroactively because a prospective only application would perpetuate a continuing equal protection violation with respect to children of unmarried parents.

Whether a statute applies retroactively raises a question of statutory construction over which our review is plenary. See, e.g., *State* v. *Nowell*, 262 Conn. 686, 701, 817 A.2d 76 (2003). "[T]he retroactive application of a law occurs only if the new or revised law was not yet in effect on the date that the relevant events underlying its application occurred." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 681, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

"Whether to apply a statute retroactively or prospectively depends upon the intent of the legislature in enacting the statute. . . . In order to determine the legislative intent, we utilize well established rules of statutory construction. Our point of departure is General Statutes § 55-3, which states: No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have retrospective effect. The obligations referred to in the statute are those of substantive law. . . . Thus, we have uniformly interpreted § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . The rule is rooted in the notion that it would be unfair to impose a substantive amendment that changes the grounds upon which an action may be maintained on parties who have already transacted or who are already committed to litigation. . . . In civil cases, however, unless con-

siderations of good sense and justice dictate otherwise, it is presumed that procedural statutes will be applied retrospectively. . . . Procedural statutes have been traditionally viewed as affecting remedies, not substantive rights, and therefore leave the preexisting scheme intact. . . . [A]lthough we have presumed that procedural or remedial statutes are intended to apply retroactively absent a clear expression of legislative intent to the contrary . . . a statute which, in form, provides but a change in remedy but actually brings about changes in substantive rights is not subject to retroactive application. . . . While there is no precise definition of either [substantive or procedural law], it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress."[8] (Citations omitted; internal quotation marks omitted.) *D'Eramo* v. *Smith*, supra, 273 Conn. 620–21. Put differently, substantive changes to statutes "in the absence of any clear expression of legislative intent to the contrary [are] presumptively prospective." Id., 623.

The relevant provisions of P.A. 04-100, which is a substantive law governing the rights to support of children of unmarried parents, have an effective date of

---

[8] This process also is consistent with our usual process of statutory interpretation, under which "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *State*, 278 Conn. 77, 82, 896 A.2d 747 (2006).

October 1, 2004, but the public act does not state explicitly whether it applies only to support orders rendered after that date. In contrast, General Statutes § 46b-84,[9] which, as amended by Public Acts 1994, No. 94-61 (P.A. 94-61), similarly extended parental obligations in divorce cases,[10] specifically provides that it "shall apply only in cases where the decree of dissolution of marriage, legal separation or annulment is entered on or after July 1, 1994."[11] General Statutes § 46b-84 (b). Thus,

---

[9] General Statutes § 46b-84 provides in relevant part: "(a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. Any postjudgment procedure afforded by chapter 906 shall be available to secure the present and future financial interests of a party in connection with a final order for the periodic payment of child support.

"(b) If there is an unmarried child of the marriage who has attained the age of eighteen, is a full-time high school student and resides with a parent, the parents shall maintain the child according to their respective abilities if the child is in need of maintenance until such time as such child completes the twelfth grade or attains the age of nineteen, whichever first occurs. The provisions of this subsection shall apply only in cases where the decree of dissolution of marriage, legal separation or annulment is entered on or after July 1, 1994. . . ."

[10] According to Senator George Jepsen, P.A. 94-61 was intended "to encourage kids to finish school" by addressing what the legislature viewed as an issue frequently left unaddressed by attorneys negotiating settlements in divorce cases. 37 S. Proc., Pt. 6, 1994 Sess., p. 1805; see also 37 H.R. Proc., Pt. 9, 1994 Sess., pp. 3066–67, remarks of Representative William Wollenberg (stating that "we must do this by statute" because of attorneys failure to "[work] this into the agreement"). In commenting in support of the bill, Senator Jepsen emphasized it was to apply only to divorces and dissolutions that were entered on or after July 1, 1994. See 37 S. Proc., supra, p. 1806.

[11] The legislature's choice of July 1, 1994, as an effective date for P.A. 94-61 indicated its view of the importance of this expanded child support benefit in the context of dissolution proceedings. By choosing July 1, as the effective date, the legislature accelerated the applicability of the statute by three months over the default effective date of October 1. See *State* v. *Nowell*, supra, 262 Conn. 703 (legislature's provision that Public Acts 2001, No. 01-99, which allows trial judges to deviate from mandatory minimum sentences in narcotics cases, " 'shall take effect July 1, 2001,' " was intended "to accelerate the effective date of the act from the default date of October 1 otherwise provided for by [General Statutes § 2-32]").

although the related statute applicable in dissolution proceedings quite clearly applies only to orders entered *after* a date certain, the legislature, in enacting P.A. 04-100, did not provide, with similar clarity, an indication of its intent with respect to its application.[12]

The legislative history similarly contains no evidence indicating clearly whether the legislature intended P.A. 04-100 to apply retroactively to court orders already in effect as of its effective date. Speaking in support of the bill that subsequently was enacted as P.A. 04-100 shortly before its passage by the House of Representatives, Representative Christopher Stone stated only that it "incorporates several of the characteristics or several of the requirements that we presently have for married couples who have children who are engaged in divorce proceedings into the provisions presently in the books for [f]amily [c]ourt magistrates and collection of child support for unmarried individuals. Most primarily and substantively, the bill extends the obligation of child support for non-married individuals who have children to a—until the child is [nineteen] years old or graduates from high school, whichever occurs first. That's the present law for individuals who are married and have children and who subsequently get divorced and is a child support obligation."[13] 47 H.R. Proc., Pt. 8, 2004

---

[12] Notwithstanding the clear statement in P.A. 94-61 that it applies only to court orders rendered on or after a date certain, we cannot conclude that the legislature's failure to include a similar provision in P.A. 04-100 indicates its intent that P.A. 04-100 applies retroactively. We recognize that, "[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." (Internal quotation marks omitted.) *Asylum Hill Problem Solving Revitalization Assn.* v. *King*, 277 Conn. 238, 256, 890 A.2d 522 (2006). We cannot, however, supply retroactive language that the legislature may have chosen to omit, especially because it specified elsewhere in the relevant provisions of P.A. 04-100 that it was to become effective on October 1, 2004.

[13] Similarly, Stephen Ment, deputy director of legislative affairs for the judicial branch, speaking in support of the bill that would be enacted as P.A. 04-100, noted that the "first four sections of the bill . . . would create parity between children of divorces and children of unmarried parents by

Sess., p. 2336; see also id., p. 2337, remarks of Representative Stone ("this bill really just provides consistency within our law").

Despite the remedial purpose of P.A. 04-100, there is insufficient evidence to permit us to conclude that the legislature intended it to apply retroactively, particularly given the limitations set forth by § 55-3. See footnote 7 of this opinion. It is, however, well settled that "[t]his court should try, whenever possible, to construe statutes to avoid a constitutional infirmity, but may not do so by rewriting the statute or by eschewing its plain language." (Internal quotation marks omitted.) *State* v. *Snook*, 210 Conn. 244, 251, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); see also, e.g., *State* v. *Lutters*, 270 Conn. 198, 217, 853 A.2d 434 (2004) ("[in] choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the

continuing support for children of unmarried parents until the child completes the [twelfth] grade or attains the age of [nineteen], whichever occurs first." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 2004 Sess., p. 2376. In response to a question from Representative G. Kenneth Bernhard about the unequal treatment of children, Ment testified "that has been an issue that . . . the [l]egislature, over the last few years, has taken a look at and has addressed. But yes, there are—currently there really are two classes, children of parents who were married and children of unmarried couples. And the [l]egislature, again, has looked at this issue for many years, but as I understand it, currently if you are the child of a couple that got divorced, you can obtain support until you finish the [twelfth] grade or attain the age of [nineteen], whichever comes first. But if you are a child of an unmarried . . . couple I believe that the support would end at the age of [eighteen]." Id., pp. 2378–79. Diane Fray, director of the bureau of child support enforcement at the department of social services, testified similarly that the "provision would extend the obligation of support in non-dissolution support cases up to the age of [nineteen] for children who are unmarried, still in high school, and living with a parent. This is presently the rule for dissolution, legal separation, and annulment cases with decrees entered on or after July 1, 1994. *Our proposal would apply the same rule for all children regardless of the marital status of their parents.*" (Emphasis added.) Id., p. 2382.

legislature's underlying intent" [internal quotation marks omitted]). Indeed, our duty to construe statutes in a manner that protects them, if possible, from constitutional jeopardy may well require us to conclude that they apply retroactively. See *In re Marriage of Bouquet*, 16 Cal. 3d 583, 588, 546 P.2d 1371, 128 Cal. Rptr. 427 (1976) (amendment to divorce statute that previously discriminated against men by providing that earnings and accumulations of wife, but not husband, while living apart were separate property, applied retroactively because "the probable constitutional infirmity of the former law does lend some support to the conclusion that the [l]egislature intended the amendment to have retroactive effect . . . [and] [w]e may reasonably infer, therefore, that the [l]egislature wished to replace the possibly infirm law with its constitutionally unobjectionable successor as soon as possible" [citation omitted]).

Accordingly, we must turn to the state's claim that construing P.A. 04-100 to apply prospectively only violates the equal protection clause of the fourteenth amendment to the United States constitution[14] with respect to the rights of children born to unmarried parents. The state argues that an equal protection violation occurs because this prospective only construction perpetuates the constitutional violation inherent in the statutory scheme that existed prior to P.A. 04-100,

[14] The federal equal protection clause, § 1, of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

The state's analysis also mentions article first, § 20, of the constitution of Connecticut, which provides in relevant part: "No person shall be denied the equal protection of the law . . . ." Although the state notes that the state constitution may afford citizens greater protection than the federal constitution, it does not provide a separate analysis of any such claim. Accordingly, our review is limited to federal constitutional principles. See, e.g., *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 294 n.9, 914 A.2d 996 (2007).

which had provided children of unmarried parents with less support than was available to the similarly situated children of parents who were married at the time of the children's birth.

It is well settled that "a [s]tate may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally. . . . [O]nce a [s]tate posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother."[15] *Gomez* v. *Perez*, 409 U.S. 535, 538, 93 S. Ct. 872, 35 L. Ed. 2d 56 (1973). This ban on discrimination exists because "the legal status of illegitimacy, however defined, is, like race or national origin, a characteristic determined by causes not within the control of the illegitimate individual, and it bears no relation to the individual's ability to participate in and contribute to society."[16] (Internal quotation marks omitted.) *Reed* v. *Campbell*, 476 U.S. 852, 854 n.5, 106 S. Ct. 2234, 90 L. Ed. 2d 858 (1986).

"In view of the history of treating illegitimate children less favorably than legitimate ones, [the United States

[15] For example, the United States Supreme Court has held it to be a violation of the equal protection clause for a state to "create a right of action in favor of children for the wrongful death of a parent and exclude illegitimate children from the benefit of such a right," or to exclude "illegitimate children . . . from sharing equally with other children in the recovery of workmen's compensation benefits for the death of their parent." *Gomez* v. *Perez*, 409 U.S. 535, 537–38, 93 S. Ct. 872, 35 L. Ed. 2d 56 (1973).

[16] "[V]isiting condemnation upon the child in order to express society's disapproval of the parents' liaisons is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent." (Internal quotation marks omitted.) *Reed* v. *Campbell*, 476 U.S. 852, 854–55 n.5, 106 S. Ct. 2234, 90 L. Ed. 2d 858 (1986).

Supreme Court has] subjected statutory classifications based on illegitimacy to a heightened level of scrutiny . . . [noting that] [a]lthough we have held that classifications based on illegitimacy are not suspect, or subject to our most exacting scrutiny . . . the scrutiny applied to them is not a toothless one . . . . [A] classification based on illegitimacy is unconstitutional unless it bears an evident and substantial relation to the particular . . . interests [the] statute is designed to serve. . . . [R]estrictions on support suits by illegitimate children will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest."[17] (Citations omitted; internal quotation marks omitted.) *Pickett* v. *Brown*, 462 U.S. 1, 8, 103 S. Ct. 2199, 76 L. Ed. 2d 372 (1983); see also *Mills* v. *Habluetzel*, 456 U.S. 91, 99–100, 102 S. Ct. 1549, 71 L. Ed. 2d 770 (1982) (striking down one year statute of limitations in support cases involving unmarried parents despite state's "interest in avoiding the litigation of stale or fraudulent claims [that] will justify those periods of limitation that are sufficiently long to present a real threat of loss or diminution of evidence" because "[b]y granting illegitimate children only one year in which to establish paternity, Texas has failed to provide them with an adequate opportunity to obtain support"). Viewed in light of these cases, it is apparent that our support statutes in effect after the effective date of P.A. 94-61, but before the effective date of P.A. 04-100 were, at the very least, subject to significant constitutional questions because

---

[17] There is, however, "a permissible basis for some distinctions made in part on the basis of legitimacy" as the Supreme Court has "upheld statutory provisions that have an evident and substantial relation to the [s]tate's interest in providing for the orderly and just distribution of a decedent's property at death." *Reed* v. *Campbell*, supra, 476 U.S. 855; id. ("state's interest in the orderly disposition of decedents' estates may justify the imposition of special requirements upon an illegitimate child who asserts a right to inherit from her father, and, of course, it justifies the enforcement of generally applicable limitations on the time and the manner in which claims may be asserted").

they provided children born out of wedlock with less support than was provided to children born to married parents.

Accordingly, we find instructive those sister state cases that have construed their support statutes to rescue them from constitutional jeopardy under the United States Supreme Court's illegitimacy case law.[18] For example, in *Doe* v. *Roe*, 23 Mass. App. 590, 591, 504 N.E.2d 659 (1987), a nineteen year old man, born out of wedlock, who lived in his mother's home while attending community college sought from the Probate Court an order extending his father's support obligation beyond the age of eighteen prescribed by the relevant statute. A person in a similar situation, but with parents who had been married at the time of his birth and subsequently divorced, could have received such sup-

---

[18] Connecticut's case law on this point is sparse. We do, however, find instructive the Appellate Court decision in *Moll* v. *Gianetti*, 8 Conn. App. 50, 53, 510 A.2d 1009 (1986), wherein that court was required to interpret the attorney's fee section of General Statutes § 46b-62 in a manner that would not discriminate against children on the basis of parentage. The Appellate Court noted that the issue "is framed by the provisions of [General Statutes] §§ 46b-61, 46b-62 and 46b-54, which, in conjunction, provide that in an action for support of an illegitimate child brought by the custodial parent, the counsel fees thereby incurred by that parent cannot be recovered from the noncustodial parent, while the fees incurred by a parent for support of a legitimate child may be recoverable from the other parent." Id., 52. The court concluded that, to "construe § 46b-62 so as to deny a custodial parent the right to collect, from the noncustodial parent, counsel fees incurred in an action under § 46b-61 for support of an illegitimate child would effectively preclude the pursuit of support from noncustodial parents on behalf of the class of illegitimate children in need of maintenance by custodial parents without funds to prosecute such suits. . . . It would be a legislative hoax to permit an action for support of illegitimate children under § 46b-61 and at the same time to bar effectively such actions for their support in cases of greatest need exhibited by custodial parents who, because of indigency, cannot even enter the courtroom for want of counsel fees." Id., 53–54. Noting "the obvious constitutional infirmity of the statute if read strictly," the court concluded that § 46b-62 "must be construed to permit the award of attorney's fees in child support actions filed on behalf of illegitimate children." Id., 54–55.

port under the statute providing for support orders in dissolution cases. Id., 592. Noting that there were no problems of proof of paternity in the case; id., 592 n.3; the court concluded that *Gomez* and the other Supreme Court cases stood for the proposition that a person born out of wedlock "constitutionally is entitled to the same type of support from his biological father, after attaining the age of eighteen and until he reaches twenty-one, as a child of divorced parents would be entitled to receive in like circumstances . . . ." Id., 593. The court relied on this proposition to interpret the Probate Court's equity jurisdiction broadly enough to allow for such postmajority support for persons born out of wedlock.[19] Id., 595; see also *Rawles* v. *Hartman*, 172 Ill. App. 3d 931, 935–36, 527 N.E.2d 680 (construing statute to give trial court discretion to provide payment of postmajority college expenses for child born out of wedlock because statute applicable to divorces provided for such payments), appeal denied, 123 Ill. 2d 566, 535 N.E.2d 410 (1988); *Gerhardt* v. *Estate of Moore*, 150 Wis. 2d 563, 571–72, 441 N.W.2d 734 (1989) (A statute denying illegitimate children the right to seek additional support from their fathers after a lump sum settlement payment is unconstitutional because "[t]he nonmarital child, unlike the marital child, is barred from seeking additional support, regardless of need. That is hardly fair to the nonmarital child, much less constitutional."); cf. *Ex parte Jones*, 592 So. 2d 608, 609 (Ala. 1991) (extending to children born out of wedlock its prior holding in *Ex parte Bayliss*, 550 So. 2d 986, 987 [Ala. 1989], giving trial courts jurisdiction to provide postmajority educational support in divorce cases).

In light of this case law and the differences in the statutes applicable to the support of children of married

[19] Indeed, the Massachusetts court also noted that the legislature subsequently had amended the support statute to provide for such support payments to persons born out of wedlock beyond their eighteenth birthdays. *Doe* v. *Roe*, supra, 23 Mass. App. 594 n.5.

and unmarried parents between 1994 and 2004, it readily is apparent that the fairness and consistency in the law provided by the enactment of P.A. 04-100 has constitutional implications. Moreover, the state has not proffered, and we cannot conceive of any "legitimate state interest" to justify this disparity that is capable of surviving the heightened scrutiny given to legitimacy based classifications. See, e.g., *Pickett* v. *Brown*, supra, 462 U.S. 8. We cannot, therefore, countenance a construction of P.A. 04-100 that would serve to perpetuate this more than ten year old constitutional violation,[20] and we conclude that P.A. 04-100 applies retroactively to extend support orders already in effect at the time of its enactment.[21] Accordingly, the trial court improperly

[20] The trial court stated that it was "not insensitive" to the state's argument that a prospective application of P.A. 04-100 would "result in countless children of unmarried parents losing support at the age of eighteen, while children of divorced parents are entitled to receive support through the age of nineteen or completion of high school." Indeed, the trial court noted that, "for eleven years, children of married and nonmarried parents were treated differently." The passage of time does not, however, render this disparity constitutionally appropriate. See *Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 630, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989) ("[h]istorical acceptance of a practice does not in itself validate that practice under the [e]stablishment [c]lause if the practice violates the values protected by that [c]lause, just as historical acceptance of racial or gender based discrimination does not immunize such practices from scrutiny under the [f]ourteenth [a]mendment"); *Walz* v. *Tax Commission*, 397 U.S. 664, 678, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970) ("no one acquires a vested or protected right in violation of the [c]onstitution by long use, even when that span of time covers our entire national existence and indeed predates it").

[21] Accordingly, we disagree with the trial court's reliance on *Hunter* v. *Hunter*, 177 Conn. 327, 330, 416 A.2d 1201 (1979), in which this court determined whether to apply retroactively Public Acts 1977, No. 77-488, codified at General Statutes § 46b-66, which gave trial courts jurisdiction to enforce written provisions in dissolution agreements, incorporated into court orders, " 'for the care, education, maintenance or support of a child beyond the age of eighteen' . . . ." This court concluded that there was insufficient evidence of legislative intent to justify application of the 1977 public act to a support order resulting from a 1969 judgment, which became effective six months after the child turned eighteen; id., 330–31; because the public act "brought about changes in substantive rights of parties to a

dismissed the state's appeal from the decision of the family support magistrate.

The judgment is reversed and the case is remanded to the trial court with direction to sustain the state's appeal.

In this opinion BORDEN, KATZ and PALMER, Js., concurred.

ZARELLA, J., concurring. Although I agree with the conclusion of the majority, I do not agree, for all of the reasons expressed in my concurrence in *D'Eramo* v. *Smith*, 273 Conn. 610, 626, 872 A.2d 408 (2005) (*Zarella, J.*, concurring), that the legislative history of Public Acts 2004, No. 04-100 (P.A. 04-100), should be consulted to determine the legislative intent. Having concluded that P.A. 04-100 is a substantive provision that contains no language specifically directing that it be retroactively applied, the majority has no reason to consult extratextual evidence of the legislature's intent. See General Statutes § 1-2z;[1] see also General Statutes § 55-3.[2] Nevertheless, I fully agree with the majority's constitutional analysis and ultimate conclusion that we cannot con-

---

cause of action for dissolution of marriage involving orders concerning children, and established a jurisdictional ground, formerly absent, under which the Superior Court may act where there is a written agreement providing for the care, education, maintenance or support of a child beyond the age of eighteen." Id., 332. *Hunter* is inapposite because, unlike the present case, the analysis therein did not present any equal protection or other constitutional implications with respect to the rights of the child in need of support.

[1] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[2] General Statutes § 55-3 provides in relevant part: "No provision of the general statutes . . . which imposes any new obligation on any person . . . shall be construed to have a retrospective effect."

strue a statute in such a way that would render it uncon-
stitutional.